**KEYSTONE LEASING CORPORATION,**
**Plaintiff,**

**v.**

**PEOPLES PROTECTIVE LIFE INSURANCE COMPANY and Continental Bankers Life Insurance Company of the South, Inc., Defendants.**

**No. 76 C 1648.**

United States District Court,
E. D. New York.

April 28, 1981.

---

**10.** This is not contested by plaintiff.

Howard Brenner, New York City, for plaintiff Keystone.

Milman, Naness & Pollack, Hewlett, N. Y., for plaintiff Fugazy.

Robert Jordan, Cole & Deitz, New York City, National Labor Relations Board, by Sarah Ellen Siskind, Brooklyn, for defendants.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

This is an action to enforce an alleged guaranty agreement. The plaintiff, Keystone Leasing Corporation ("Keystone") seeks to enforce a guaranty purportedly made by the defendant, Peoples Protective Life Insurance Company ("PPLIC") of the financial obligations of Preferred Development Corporation ("Preferred") incurred pursuant to certain equipment leases. Keystone contends that it justifiably relied upon the representations made by PPLIC and thus, the defendant must be estopped from denying the validity of the guaranty. The defendant denies that the guaranty is an enforceable obligation of PPLIC. In the alternative, the defendant denies that the guaranty, if deemed to be valid, is of a continuing nature. PPLIC asserts, *inter alia*, that, as a matter of law, the guaranty was illegal under state law; that the Board of Directors of PPLIC did not approve the making of the guaranty with Keystone; that Keystone could not reasonably have relied upon any purported representations made by PPLIC.

The issues were presented to the court in a non-jury trial. Thereafter, the parties submitted their proposed findings of fact and conclusions of law. After examining the extensive record, the court finds that the defendant has established that the guaranty is not an enforceable obligation of PPLIC. Accordingly, the complaint must be dismissed. The basis for the conclusion follows.

## FINDINGS OF FACT

The relevant dates and circumstances incident to the making of a guaranty dated July 8, 1971 ("guaranty") are hotly in dispute. The non-jury trial held before this court brought into perspective the degree of deception and scheming which surrounded the signing of the guaranty. Consequently, the court carefully scrutinized the credibility of each witness and then sought to discern the most logical and reasonable inferences and conclusions which could be drawn from the conflicting facts.

Keystone is a domestic corporation of the State of New York and is engaged in the leasing of equipment. Specifically, under usual circumstances, once Keystone had approved the credit worthiness of a prospective lessee, it routinely would purchase specific equipment from third party vendors which had been selected by the lessee. It then would lease this equipment to the lessee pursuant to a lease agreement which provided for periodic rental payments. The obligation to pay such rental charges commenced once the lessee had received and approved of the equipment by executing a completion certificate.

A linch pin to these lease arrangements often was provided by the independent lease broker. Independent lease brokers would attempt to locate prospective lessees, and thereafter, would solicit leasing companies, like Keystone, with this potential source of business. The broker then received a commission if a lease arrangement was effectuated. Keystone, aware of this mechanism for securing lessees, occasionally used the services of such independent brokers by advertising its interest in trade journals.

During the relevant time, Preferred and PPLIC were wholly owned subsidiaries of Peoples Protective Corporation ("PPC"). All three corporations were duly organized under and pursuant to the laws of the State of Tennessee. PPLIC is a Tennessee life insurance company; Preferred was engaged in the development of a resort site in Tennessee known as English Mountain.

According to the credited testimony of Billy Jack Goodrich, General Counsel to PPLIC and later PPC, the Smith family, particularly Robert B. Smith, III, exercised significant control over the three Tennessee companies. The Smiths were the majority shareholders of the parent company, PPC. Robert B. Smith, Jr. was the Chairman of PPC and his son, Robert B. Smith, III, served as a director and the President of both PPC and PPLIC. While Mr. Goodrich was unable to explain some of the events which transpired with regard to the guaranty, his testimony was credible. His explanation of the operations of the three companies reveals that the Smiths controlled Preferred and were the principal movers in developing the English Mountain project, which was managed by Preferred. In point of fact, the Smiths, as officers and directors of PPC, PPLIC and Preferred, were keenly interested in enabling Preferred to obtain equipment leases from a lessor such as Keystone.

As for the interrelationship among the three companies, while it can be said that corporate ties existed between PPC and its various subsidiaries, it is also true that PPLIC functioned independently of PPC and the other affiliates. Mr. Goodrich testified that the functions of the parent company or its subsidiaries were not performed by the home office personnel of PPLIC. Conversely, the life insurance functions of PPLIC were not performed by either PPC or Preferred. It was acknowledged that some of the officers of PPC and PPLIC were common to both corporations. However, there were a significant number of officers, directors and home office personnel who acted solely with respect to one company or the other.

Further, the potential opportunities occasioned by the formation of PPC in 1968 underlie the separate nature and the distinct powers exercised by the parent and the life insurance company. By way of example, PPC was formed, *inter alia,* so that there could be diversification of investment "not afforded an insurance company." In essence, many of the restraints which encumbered the life insurance company did not exist vis a vis the parent.

With respect to the financial status of the various subsidiaries of PPC, it is beyond cavil that PPLIC appeared to be the most financially sound. *Indeed,* PPLIC had loaned approximately 600,000 dollars to Preferred prior to the lease transactions with Keystone. Mr. Goodrich conceded that he, and others at PPLIC, had knowledge of these specific loan arrangements with Preferred which the Smiths had engineered. However, it was also understood that such loans with Preferred were all fully secured by real estate mortgages and were not unsecured loans of working capital.

In as much as a large percentage of the assets of Preferred were tied up in English Mountain, it could be said that PPLIC maintained an interest in the success of the resort. Most significantly, the Smiths, as majority shareholders of PPC and its affiliates, were keenly interested in the success of the resort complex and, as revealed by the testimony and records, used their positions as officers and directors of PPC and PPLIC to effectuate that end.

The negotiations surrounding the lease arrangements between Preferred and Keystone were handled almost exclusively by W. R. Lichota. Lichota, an independent lease broker, introduced Preferred, as a potential lessee in need of financing, to Keystone, a lessor. The testimony indicated that Keystone made all arrangements through Lichota concerning the equipment leases with Preferred for the development of English Mountain. Lichota was neither an officer nor director of PPC, Preferred or PPLIC. According to the credited testimony of Mr. Goodrich, while Lichota dealt with Preferred, and to some extent with PPC, he did not work with, or act on behalf of, PPLIC.

As the testimony developed, it became clear that the point in time at which Lichota began negotiations with Keystone and the date, if *indeed* one existed, on which the Board of Directors of PPLIC acted upon the proposed guaranty were the pivotal factual questions presented to the court. In seeking to prove the validity of the guaranty, Keystone, through its former President, Wallace C. Bernstein, contended the following, to wit: (1) that Keystone first dealt with Lichota during the first three months of 1971; (2) that before the execution of any lease with Preferred, Keystone had received the financial statements of Preferred, PPC and PPLIC and had determined that a guaranty from PPLIC would be necessary as a condition to the signing of any lease with Preferred; (3) that the April 26, 1971 corporate resolution of PPLIC effectively guaranteed several equipment leases between Keystone and Preferred.

By using a measure of common sense in order to piece together the series of events in 1971, it became clear to the court, after reviewing the record, that Keystone's argument in general, and Bernstein's testimony in particular, could not be deemed credible and could not be credited with any degree of consistency. In a word, Bernstein's account of the negotiations among Keystone, Preferred, PPC and PPLIC conflicted with the evidence before the court.

Keystone, at trial, introduced corporate resolutions of PPC and PPLIC dated April 26, 1971 and the guaranties of PPC and PPLIC dated July 8, 1971 which purportedly guaranteed the prompt performance by Preferred of the provisions of a lease arrangement with Keystone. Bernstein stated that Keystone had made its credit decision with regard to Preferred, including the need for such guaranties from PPLIC and PPC, during the early part of 1971. The court, after assessing the testimony and record, finds that this contention is wholly untenable. Further, the court finds that PPLIC could not have guaranteed the obligations of Preferred prior to August 25, 1971.

According to Bernstein, the final negotiating stage for the Preferred leases was reached only after preliminary negotiations were had between Alexander, a Vice President of Keystone, and Lichota. After these preliminary discussions, Bernstein had a decisive role in determining whether credit would be extended. Significantly, the final determination concerning approval of a lease arrangement with Preferred was made only after a thorough examination of a financial statement which included information on PPC, PPLIC and Preferred and second, discussions with Lichota.

In light of this procedure employed by Keystone, the court concludes that there were no dealings between Keystone and PPLIC until after April of 1971. The court makes this finding on the basis of the facts which follow. On June 5, 1971, Patricia Techet, from Lichota's office, first wrote to Alexander, Vice President of Keystone, with regard to a customer of Lichota, namely, PPC. The letter effectively introduced PPC to Keystone, requested the extension of credit, and included, as enclosures, the 1970 Annual Report of PPC and its bank reference. Thus, while there may have been meetings between Lichota and PPC prior to April 26, 1971, it is clear that there were no dealings between Keystone and PPLIC until after that date.

It was conceded that no correspondence between Lichota's office and Keystone predated the June 5, 1971 letter. Further, the President of Keystone stressed that his company had been very cautious with the Preferred leases insofar as Lichota had indicated that he eventually would seek loans amounting to a quarter million dollars. That amount was the largest lease Keystone ever had handled for one lessee. It thus stands to reason that if Keystone had dealt with Lichota in the early part of 1971, it would have had in its possession some correspondence with Lichota prior to June 5, 1971. It thus is apparent from the June 5, letter and the testimony, that Keystone had no knowledge of the financial condition of PPLIC until after June 5, 1971.

In light of Bernstein's testimony, to wit, that the decision to require a guaranty from PPLIC was not made until after he had carefully examined the 1970 Annual Report of PPC and he had spoken with Lichota, the court concludes that the need for a guaranty by PPLIC could not have been determined until well after April 26, 1971. Indeed, PPLIC could not have guaranteed the obligations of Preferred prior to August 25, 1971, notwithstanding Keystone's possession of a guaranty of PPLIC dated July 8, 1971 and the PPLIC Corporate Resolution of April 26, 1971 which was allegedly prepared and signed on July 8, 1971.

The facts indicate that some time between July 22, 1971 and mid-August 1971, Lichota forwarded to Keystone a Corporate Resolution of the Board of PPC dated April 26, 1971 and executed on July 22, 1971, which allegedly guaranteed a lease between Preferred and Keystone. The documentary evidence before the court indicates that Keystone was not satisfied with this form (the "Lichota form"). Thereafter, in a letter dated August 25, 1971, Keystone transmitted to Lichota, for the execution by the officers of both PPC *and* PPLIC, its standard form of lease guaranty ("the Keystone form"). Keystone partially completed these forms before forwarding them to Lichota on August 25, 1971. Among other things, Keystone pre-dated the guaranties and resolutions to appear as if they had been executed on July 8, 1971.

The Keystone forms transmitted in August differed from the initial form forwarded by Lichota which dealt with a resolution by the Board of PPC executed and signed on July 22, 1971. Thus, the inescapable conclusion is that Keystone indulged in the backdating and rewording of corporate documents.

Significantly, while the minutes of a Board of Directors' Meeting of PPC which were executed on July 22, 1971 indicate that at a meeting on April 26, 1971 the guaranty of leases was discussed, no similar discussion appears in the corporate minutes of PPLIC. Further, the General Counsel of PPLIC testified that he, as well as others at

PPLIC, were unaware of the claim that the insurance company had guaranteed any leases of Preferred until the institution of this action.

It can be argued that, insofar as PPC and PPLIC can be characterized as interwoven entities, if PPC had adopted a resolution concerning a guaranty on April 26, 1971, PPLIC, whose Board allegedly met on that same day, took similar action. As previously indicated, however, the June 5, 1971 letter from Lichota's office demonstrates that there were no dealings between Keystone and PPLIC until after April 26, 1971.[1]

Finally, Keystone argues that the resolution and guaranty forms dated July 8, 1971 originated from Lichota's office. Plaintiff contends that insofar as blank sets of Keystone forms were circulated throughout the country, Lichota may have been in possession of such forms prior to June of 1971. The August 25, 1971 letter forwarding Keystone's "guaranty form and the proper corporate resolution authorizing both the lease and the guaranty" is clearly inapposite to that proposition.

In summary, the court finds that the Board of Directors of PPLIC never authorized a guaranty of equipment leases between Preferred and Keystone. At the earliest juncture, between June 5, 1971 and July 22, 1971, a corporate resolution may have been passed by the Board of PPC concerning the guaranty. This form, however, was not accepted by Keystone. At some point subsequent to August 25, 1971, Lichota had officers of PPC and PPLIC sign Keystone's form of guaranty and corporate resolution. However, no majority of the Board of Directors of PPLIC ever approved this latter resolution. Indeed, the Lichota resolution which was executed on July 22, 1971 and initially forwarded to

Keystone, was never adopted by the Board of PPLIC.

As for the equipment leases, the record indicates that prior to August 25, 1971, three leases numbered 489, 502 and 503 were executed between Keystone as the lessor and Preferred as the lessee. Here again, Bernstein admitted that backdating of the execution dates of certain leases occurred. However, the President was able to pinpoint the date of the completion certificate applicable to lease number 489 as August 13, 1971. The findings of the court, however, indicate that PPLIC could not have guaranteed the obligation of Preferred until some time subsequent to August 25, 1971. For it was pursuant to the August letter that Keystone specifically sought the guaranty of PPLIC, in addition to the guaranty of PPC. Significantly, the requested guaranties and resolutions, which allegedly accompanied those obligations, were now drafted by the Keystone staff.

The dilemma facing Keystone and Preferred is now simple to state. Specifically, with regard to the guaranty, Tennessee law required action by the Board of Directors.[2] Insofar as the Directors of PPC and PPLIC had met on April 26, 1971, Keystone's requests could be accommodated. At this point, however, signed documentation must yield to logic. For, while there may have been a Board meeting of PPC and PPLIC on April 26, 1971, PPLIC could not have known of the proposed leases on that date and therefore, could not have authorized the purported guaranty.

In light of the foregoing, Keystone must have been aware of the suspect nature of the Corporate Resolution. Further, reasonable inquiry on the part of Keystone would have disclosed that the purported guaranty served the financial interests of several of-

1. In passing, the court notes that there is an apparent conflict between the testimony of Goodrich concerning when he saw PPC's resolution and the June 5, 1971 letter which seemingly first introduced Keystone to PPC. However, the weight of the evidence indicates that while there may have been negotiations between Lichota and PPC within the first five months of 1971, there is clearly no indication of

involvement by Keystone until after June of 1971.

2. Tenn.Code Ann. § 48–403 (1980). Further, New York law may be viewed as even more restrictive insofar as shareholder approval was required to authorize such a guaranty. See N.Y.Bus.Corp.Law § 908 (McKinney 1963).

ficers of PPLIC and that the directors of PPLIC had not authorized the guaranty. Bernstein testified that Keystone had no knowledge of the officers or the controlling members of management of PPLIC. In point of fact, even a cursory inquiry would have disclosed the legal barriers, and the consequent inconsistencies, surrounding the making of the guaranty.

## CONCLUSIONS OF LAW

In defense to plaintiff's claim that the guaranty dated July 8, 1971 is an enforceable obligation of PPLIC, the defendant contends the following: (1) the guaranty was illegal under Tennessee's Corporation Law; (2) the guaranty was illegal under Tennessee's Insurance Law; (3) any reliance by Keystone on the Certificate of Corporate Resolution ("Certificate") was misplaced. The plaintiff contends that PPLIC is estopped from denying the representations made in the Certificate. On the basis of the record before it, the court finds that the guaranty is not an enforceable obligation of PPLIC. Consequently, the claim of a continuing guaranty is moot.

At the initial stage, the court was faced with a choice of law problem. Was the question of the enforceability of the guaranty to be resolved under New York law, as provided in the guaranty, or under Tennessee law? While the court finds that the application of Tennessee law is appropriate, it is unlikely that the result would have differed under New York law.

■ A federal court presented with a conflict of laws issue in a diversity case must apply the conflicts law of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1070, 85 L.Ed. 1477 (1941). A number of New York cases have held that where the parties to an agreement have included a choice of law provision, effect is to be given to their choice. *See, e. g., A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957). The more modern view, however, holds that while the parties' choice of law is to be given considerable weight, the law of the jurisdiction with the "most significant contacts" is to be applied. *See Haag v. Barnes*, 9 N.Y.2d 554, 175 N.E.2d 441, 216 N.Y.S.2d 65 (1961); *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954); *Joy v. Hendrick & Struggles, Inc.*, 93 Misc.2d 818, 403 N.Y.S.2d 613 (Civ.Ct., 1977). *See also* Restatement (Second) Conflict of Laws § 187 (1971); *LaBeach v. Beatrice Foods Co.*, 461 F.Supp. 152 (S.D.N.Y.1978); *Southern International Sales Co. v. Potter & Brumfield Division of AMF Inc.*, 410 F.Supp. 1339 (S.D.N.Y.1976); *Fricke v. Isbrandtsen Co.*, 151 F.Supp. 465 (S.D.N.Y.1957).

■ The facts in the instant case indicate that Tennessee is the site of the most significant contacts and that fundamental policies of that state, as reflected in its insurance and corporation laws, were involved.[3] Contrasted with Tennessee's regulatory interest, the New York contacts are of far less weight and significance.[4] Further, the

3. Tennessee Code Annotated § 48–403 provides:

"A corporation shall have power to guarantee obligations of any other entity and to secure such guarantee by mortgage, pledge or otherwise by *vote of a majority of the entire board*, unless such power is reserved to the shareholders of members in the charter." (Tenn.Code Ann.1980). (emphasis added)

Tennessee Code Annotated § 56–3–103 provides as follows:

"No director or other officer of any domestic insurance company organized under the laws of Tennessee . . . shall accept, or be the beneficiary of, either directly or remotely, any fee, brokerage, commission, gift or other consideration for or on account of any loan, depos-

it, purchase, sale, payment or exchange made by or on behalf of such company, or be pecuniarily interested in any such purchase, sale, or loan, either as borrower, principal, coprincipal, agent, or beneficiary . . ." (Tenn. Code Ann.1980).

4. New York Business Corporation Law § 202(a)(7) provides:

"Each corporation, subject to any limitations provided in this chapter or any other statute of this state or its certificate of incorporation, shall have power in furtherance of its corporate purposes . . . to make contracts, give guarantees and incur liabilities . . . ." (McKinney 1963).

New York Business Corporation Law § 908 provides:

applicable Tennessee statutes do not violate the public policy of New York.[5] Consequently, the court is constrained to follow Tennessee law.

## VALIDITY OF THE GUARANTY

Under Tennessee corporation law, a corporation has the authority to guaranty the obligations of another entity only "by vote of a majority of the entire board [of directors]." Tenn.Code Ann. § 48–403 (1979). The requisite board action was not accomplished in the instant case. The April 26, 1971 Certificate of Corporate Resolution, which purportedly authorized the guaranty by PPLIC's Board of Directors, clearly was invalid. The facts indicate that there were no dealings between Keystone and PPLIC until some date subsequent to April 26, 1971.

■ Bernstein testified that Keystone's decision with respect to a loan arrangement with Preferred and the desired guaranties, was determined only after discussions with Lichota and an examination of financial information on PPLIC. Consequently, Bernstein could not have concluded the need for the guaranty of PPLIC until after the June 5, 1971 letter from Lichota's office. Further, the weight of the evidence indicates that Keystone did not request execution of a written guaranty from PPLIC until August of 1971. Indeed, PPLIC could not have guaranteed the obligations of Preferred prior to August 25, 1971, when Keystone transmitted its standard form of lease guaranty to Lichota. In light of the foregoing, the court finds that the Board of Directors of PPLIC never authorized the Guaranty dated July 8, 1971.[6]

Insofar as a majority of the Board of Directors never authorized the guaranty, the July 8, 1971 Guaranty is violative of the state statute. *See, e. g., Alleghany Corp. v. James Foundation of New York*, 214 F.2d 446 (2d Cir. 1954), *cert. denied*, 348 U.S. 913, 75 S.Ct. 293, 99 L.Ed. 716 (1955); *Botany Industries, Inc. v. New York Joint Bd., Amalgamated Clothing Workers of America*, 375 F.Supp. 485 (S.D.N.Y.), *vacated on other grounds*, 506 F.2d 1246 (2d Cir. 1974); *City of Tullahoma, Tennessee v. Coffee County, Tennessee*, 204 F.Supp. 794 (E.D. Tenn.1962), *cert. denied*, 379 U.S. 989, 85 S.Ct. 698, 13 L.Ed.2d 609 (1965); *Virginia Surety Co. v. Knoxville Transit Lines*, 135 F.Supp. 606 (E.D.Tenn.1955); *Parsky Funeral Home, Inc. v. Shapiro*, 83 Misc.2d 566, 372 N.Y.S.2d 288 (Monroe Cty., 1975).

The plaintiff contends that board meetings were held by PPLIC and PPC on April 26, 1971 and that, at the latter's meeting, a guaranty was discussed. The plaintiff sug-

"A guarantee may be given by a corporation, although not in furtherance of its corporate purposes, when authorized at a meeting of its shareholders by a vote of the holders of two-thirds of all outstanding shares entitled to vote thereon ..." (McKinney 1963).

New York Insurance Law § 78(4) provides as follows:

"No director or officer of an insurer doing business in this state shall receive, in addition to his fixed salary or compensation any money or valuable thing, either directly or indirectly, or through any substantial interest in any other corporation or business unit, for negotiating, procuring, recommending or aiding in any purchase or sale of property, or loan, made by such insurer or any affiliate or subsidiary thereof; nor shall he be pecuniarily interested, either as principal, co-principal, agent or beneficiary, either directly or indirectly, or through any substantial interest in any other corporation or business unit, in any such purchase, sale or loan ..." (McKinney 1969).

5. In large measure, there is no substantive difference between New York and Tennessee law regarding legislative controls over abusive exercises of corporate power in the issuance of guarantees. *Compare* N.Y.Bus.Corp.Law §§ 202(a)(7) and 908 (McKinney 1963) with Tenn.Code Ann. § 48–403 (1979). Further, both states have insurance statutes which discourage dealings by insurance companies which benefit the directors of such companies. *Compare* N.Y.Ins.Law § 78(4) (McKinney Supp. 1979–80) *with* Tenn.Code § 56–3–103 (1980).

6. The following exhibits are pertinent to a resolution of the question concerning the enforceability of the guaranty. *Compare* Plaintiff's Exhibit 2 (Corporate Resolution of PPLIC dated July 8, 1971) *with* Defendant's Exhibits B (April 26, 1971 Board of Directors' Meeting of PPLIC), C–2 (Answers to Request for Admission, F (Corporate Resolution of PPC dated July 22, 1971). *See also* Defendant's Exhibits D and G.

gests that, insofar as the same people attended both meetings, it could be argued that the board of directors of PPLIC did authorize the guaranty in question. The court rejects this line of reasoning. Despite the close connection between PPLIC and its parent corporation, PPLIC, in fact, and as mandated by law, functioned independent of the other subsidiaries and not as an integrated enterprise.[7] *See Garrett v. Southern Railway*, 173 F.Supp. 915 (E.D. Tenn.1959), *aff'd* 278 F.2d 424 (6th Cir.), *cert. denied*, 364 U.S. 833, 81 S.Ct. 49, 5 L.Ed.2d 59 (1960). *See also Blackwell Industrial Foundation, Inc. v. Texstar Corp.*, 387 F.2d 708 (10th Cir. 1968). *Cf. NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); *Majestic Factors Corp. v. Latino*, 15 Misc.2d 329, 184 N.Y. S.2d 658 (Sup.Ct.1959); Annot. 7 A.L.R.3d 1343 (1966).

Second, as previously concluded, the guaranty could not have been brought to the attention of PPC or PPLIC until after April 26, 1971. Third, the forms forwarded to PPC and PPLIC with the August 25, 1971 letter represent specific demands on PPC and PPLIC. Further, the Keystone forms represent a rewording and pre-dating of the initial Resolution of PPC dated July 22, 1971. Thus, the Board of PPLIC could not have authorized the specific guaranty in question prior to August 25, 1971.

The guaranty also is violative of Tennessee insurance law. Tennessee law provides that no director or officer of a domestic insurance company may "be the beneficiary of, either directly or remotely, any . . . exchange made by or in behalf of such company, or be pecuniarily interested in any such purchase, sale or loan, as . . . beneficiary." Tenn.Code Ann. § 56–3–103 (1980).

Here, it is undisputed that the Smiths served as officers and directors of both PPC and PPLIC and were the principal shareholders of PPC. Moreover, the Smiths exercised substantial control over Preferred, were the principal movers in the English Mountain project and had a significant interest in securing the success of that resort project. The financial interest of the Smiths, in realizing profits from the land development ventures of Preferred, conflicted with their status as officers and directors of PPLIC. Indeed, this situation is precisely the state of affairs which the statute seeks to prevent.

Tennessee law strictly proscribes the use of assets of its domestic life insurance companies so as to protect the policy holders. *See Continental Bankers Life Ins. Co. v. Bank of Alamo*, 578 S.W.2d 625, 636 (Tenn. 1979). Tennessee law provides that no domestic life insurance company may invest or loan its assets in any manner other than as provided in § 56–3–301 through § 56–3–306 of the Tennessee Code. *See* Tenn.Code Ann. § 56–3–307 (1980). The list of approved transactions is a narrow one and does not include the issuance of guaranties of the liabilities of other corporations. Thus, a guaranty, as in the instant case, violates the purpose of the strict state regulation of insurance company assets. *See Continental Bankers Life Ins. Co. v. Bank of Alamo, supra.*

### ESTOPPEL

■ It is the cornerstone of Keystone's argument that PPLIC's Certificate of Corporate Resolution, which was executed by the Secretary of the corporation and which purportedly authorized the July 8, 1971 Guaranty, estops PPLIC from asserting that the guaranty was executed without corporate authority. Where a corporation clothes an officer with authority and that officer makes representations which are reasonably relied upon in good faith by a third person, the corporation is estopped from denying such representations. *See Shear v. National Rifle Association of America*, 606 F.2d 1251 (7th Cir. 1979); *Kenneally v. First National Bank of Anoka*, 400 F.2d 838, 89 S.Ct. 716, 21 L.Ed.2d 706 (8th Cir. 1968), *cert. denied*, 393 U.S. 1063 (1969); *Doric Company v. Leo Jay Rosen Associates, Inc.*, 303 F.2d 817 (5th Cir. 1962); H. Henn, *Law of Corporations* § 226

---

**7.** Further evidence of the life insurance company's existence as a distinct entity can be adduced from the fact that the plaintiff sought the guaranty from it, as well as the parent, PPC.

(1970). Reasonableness of reliance, however, is an essential element for establishing liability on the basis of estoppel. *In Re Drive-In Development Corp.*, 371 F.2d 215 (7th Cir. 1966), *cert. denied*, 387 U.S. 909, 87 S.Ct. 1691, 18 L.Ed.2d 626 (1967). *See generally Karavos Compania Naviera S. A. v. Atlantica Export Corp.*, 588 F.2d 1 (2d Cir. 1978); *National Surety Corporation v. Inland Properties, Inc.*, 286 F.Supp. 173 (E.D. Ark.1968), *aff'd* 416 F.2d 457 (8th Cir. 1969). Further, in the case of representations by an officer of a corporation or in a corporate document, only those who have acted in reliance upon those representations may pursue an estoppel argument. *See generally Kenneally v. First National Bank of Anoka*, 400 F.2d 838 (8th Cir. 1968) *cert. denied*, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969).

■ Whether one had the right to rely on representations by an officer of a corporation or in a corporate document, in any particular case will depend upon the circumstances involved, such as the form of the representation, the relations of the parties, and their respective means of knowledge. Annot., 17 C.J.S. § 163 (1963). Specifically, a guarantor is not liable for the consequences of the guarantee's own negligence or bad faith. *See, e. g., Krafft v. Citizen's Bank*, 139 A.D. 610, 124 N.Y.S. 214 (1st Dep't 1910).

Here, the testimony indicates that Keystone made no inquiry as to the officers or the management of PPLIC or PPC.[8] However, reasonable reliance on the part of Keystone would have disclosed that the purported guaranty served only the interests of several of the officers of PPLIC who were also the principal shareholders of PPC. Further, Keystone had not concerned itself with even a cursory investigation into the legal limitations placed upon a Tennessee

life insurance company. Finally, the circumstances under which Keystone obtained the certificate should have made it suspect of its authenticity. Specifically, as evidenced by the documents and testimony before the court, Keystone must have been aware that the Board of Directors of PPLIC could not have authorized the specific guaranty in question on April 26, 1971.

■ The court recognizes the general rule that a corporation is estopped from denying representations made by its secretary in a certificate of resolution. *In Re Drive-In Development Corp., supra.* This rule, however, is tempered by certain established propositions. First, estoppels are not favored in the law. *See Sturkie v. Bottoms*, 203 Tenn. 237, 310 S.W.2d 451 (1958); *Moore v. Carter*, 38 Tenn.App. 603, 277 S.W.2d 427 (1954). Second, the presence of a corporate seal does not effect the validity of an instrument. Tenn.Code Ann. § 48–404 (1979). Third, estoppel requires that there be no knowledge, either actual or constructive on the part of the relying party that the representation was untrue. *See In Re Drive-In Development Corp., supra; Ryan v. Lumbermen's Mutual Casualty Co.*, 485 S.W.2d 548 (Tenn.1972); *Provident Washington Ins. Co. v. Reese*, 213 Tenn. 355, 373 S.W.2d 613 (1963); *Callahan v. Town of Middleton*, 41 Tenn.App. 21, 292 S.W.2d 501 (1954); *Gause v. Commonwealth Trust Co.*, 196 N.Y. 134, 89 N.E. 476 (1909). Clearly, as to the third requirement, such was not the case here. Fourth, Tennessee law states that "[o]ne claiming benefit of estoppel must have proceeded with the utmost of good faith," *Fourth Nat'l Bank v. Nashville, C. & St. L. Ry. Co.*, 128 Tenn. 530, 161 S.W. 1144 (1913) and must have relied without having the opportunity to know the truth. *Warren Bros. Co. v. Metropolitan Gov't of Nashville & Davidson*

8. Furthermore, blind reliance to representations made by Lichota and the wholesale imputing of such representations to PPLIC would be unreasonable under the circumstances. The authority of an agent, and its nature and extent, is established by tracing its source in some word or act of the alleged principal. *See generally Karavos Compania Naviera S. A. v.*

*Atlantica Export Corp.*, 588 F.2d 1 (2d Cir. 1978); 1 Mechem, Agency § 285 (1941). Here, Keystone knew that Lichota was an independent broker and not an employee of PPLIC. Finally, there is little evidence in the record to demonstrate that Keystone, at any time, sought to establish that the officers and directors at PPLIC were even aware of the transaction.

*County*, 540 S.W.2d 243 (Tenn.App.1976); *Escue v. Lux Time Div. of Robertshaw Controls*, 225 Tenn. 533, 472 S.W.2d 228 (1971).

A multiplicity of factors thus militate against a finding that PPLIC must be estopped to deny the representations made in the Certificate of Corporate Resolution. Here, reasonable inquiry by Keystone would have disclosed the fact that the Board of Directors of PPLIC never authorized the purported guaranty. On the basis of the facts before the court, it is apparent that Keystone was on notice of the suspect nature of the Resolution. *See generally Scientific Holding Co., Ltd. v. Plessey, Inc.*, 510 F.2d 15 (2d Cir. 1974); *National Surety Corp. v. Inland Properties, Inc.*, 286 F.Supp. 173 (E.D.Ark.1968), *aff'd*, 416 F.2d 457 (8th Cir. 1969). Thus, notwithstanding the presence of a Certificate of Corporate Resolution, the laws of Tennessee and Keystone's knowledge of the implausibility of the Certificate's veracity, militate against a finding that PPLIC is estopped to deny the validity of the guaranty.

## PUBLIC POLICY

The court is cognizant of two other elements which are applicable to the instant action. First, there is precedent for the proposition that a corporation which enters into a contract which is void "because the corporation making it was without authority . . . because against public policy, is never estopped to assert is invalidity." *See Sherman & Ellis v. Indiana Mutual Casualty Co.*, 41 F.2d 588, 591 (7th Cir.), *cert. denied*, 282 U.S. 893, 51 S.Ct. 107, 75 L.Ed. 787 (1930). *See also Central Transp. Co. v. Pullman's Car Co.*, 139 U.S. 24, 11 S.Ct. 478, 35 L.Ed. 55 (1891).

Second, it is submitted that the nature of the defendant's organization, specifically, here, an insurance company, is material to the central issue before this court. *See, e. g., Gause v. Commonwealth Trust Co., supra*. Courts, for example, in considering the effect of ultra vires acts, have recognized the distinction between business and trading corporations and corporations whose purposes are largely fiduciary. *See,* *e. g., Hess v. Sloane*, 66 A.D. 522, 73 N.Y.S. 313 (1st Dep't 1901), *aff'd*, 173 N.Y. 616, 66 N.E. 1110 (1903). Of import to the case at bar, it is significant that courts have held that where a lender has knowledge that it is dealing with the reserve funds of a life insurance company, the lender is charged with notice that use of the funds is restricted for the protection of the policyholders. *See, e. g. Continental Bankers Life Insurance Co. v. Bank of Alamo, supra* at 636. *See also National Surety Corp. v. Inland Properties Inc.*, 286 F.Supp. 173 (E.D.Ark. 1968), *aff'd*, 416 F.2d 457 (8th Cir. 1969). Thus, a life insurance company, in the eyes of the law, is subject to close scrutiny insofar as it occupies a fiduciary position.

## CONCLUSION

The purported guaranty by PPLIC was violative of the corporate and insurance laws of the State of Tennessee. The issuance of the guaranty was laden with ambiguities and conflicting facts. These points were known, or should have been known to the plaintiff. Such knowledge precludes a claim of reasonable reliance on behalf of Keystone. For the aforementioned reasons, this court finds that the complaint must be dismissed.

SO ORDERED.