## TRIAD FINANCIAL ESTABLISHMENT, Plaintiff,

v.

## The TUMPANE COMPANY, Defendant.

### No. 79–CV–437.

United States District Court, N.D. New York.

June 10, 1985.

Hale & Dorr, Boston, Mass., Bond, Schoeneck & King, Syracuse, N.Y., for plaintiff; James D. St. Clair, Richard J. Innis, Thomas N. O'Connor, Boston, Mass., John J. Dee, Syracuse, N.Y., of counsel.

Patterson, Belknap, Webb & Tyler, New York City, Coupe, Abend & Connors, Utica, N.Y., for defendant; Michael B. Mukasey, Eugene Gelernter, New York City, J. Leo Coupe, Utica, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiff, Triad Financial Establishment ["Triad"] brings this breach of contract action against defendant, The Tumpane Company ["Tumco"], seeking more than $3.5 million in commissions allegedly owed to Triad under the contracts between the parties. Presently before the court are cross-motions for summary judgment. For the reasons set forth below Triad's motion for summary judgment is denied and Tumco's motion for summary judgment is denied in part and granted in part.

### Background

Plaintiff Triad is a Liechtenstein entity controlled by Adnan Khashoggi, a well-known Saudi Arabian businessman. Triad describes itself as a "marketing and consulting organization" that "assists its clients in locating, identifying, and participating in international business ventures, particularly in Saudi Arabia." *Plaintiff's Memorandum* at 9. Defendant Tumco is a New York corporation with its principal place of business in Vancouver, Washington. Tumco is primarily engaged in providing support services such as housing, transportation, food services and health facilities for large military projects.

In 1971 the United States agreed to equip and modernize the Royal Saudi Air Force of the Kingdom of Saudi Arabia ["Saudi Arabia"] through a long range, multibillion dollar program called "Peace Hawk" ["Peace Hawk" or "program"]. In accordance with the terms of the Foreign Military Sales ["F.M.S."] Contract, the Northrop Corporation ["Northrop"] was designated the prime contractor for the entire program.[1] Defendant Tumco was interested in being named as the sole-source subcontractor for support services on the

Peace Hawk program. On December 1, 1971, Triad and Tumco entered into two agreements wherein Tumco appointed Triad as its marketing agent to assist Tumco in obtaining the Peace Hawk support services subcontract from Northrop.

The Peace Hawk program proceeded in phases. In phases I, II, IV, and VI, Saudi Arabia purchased Northrop F–5 aircraft and related hardware from the United States. In phases III, III Extension ["IIIE"], V, and VII, Saudi Arabia contracted for support services related to the arms purchases. For each of the phases Northrop was the United States government's prime contractor. Tumco was awarded the support services subcontract for phases III (covering the period from April 4, 1972 to August 15, 1975), phase IIIE (covering the period from August 16, 1975 to February 15, 1976), and phase V (covering the period from February 16, 1976 to June 19, 1979).

Triad contends that it has performed all of its obligations under the agreement and is entitled to commissions in excess of $3.5 million. Tumco contends that it does not owe Triad any commissions and has counterclaimed for the return of $1.7 million already paid to Triad under the agreements.

### Discussion

■ Federal Rule of Civil Procedure 56(c) provides that a court may enter summary judgment for a party if there are no genuine issues of material fact in dispute and the party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980). In discussing whether summary judgment is proper in cases involving interpretation of a contract the Second Circuit recently stated:

> pany such as Northrop for delivery of the products and services to the foreign country. This arrangement allows the foreign government to look to the United States for compliance with the contract.

1. In Foreign Military Sales contracts, the United States Department of Defense contracts to sell products and services directly to a foreign country pursuant to a "Letter of Offer and Acceptance." The Defense Department then enters into a second contract with an American com-

The law in this circuit is clear: "where a contract is not wholly unambiguous, summary judgment must be denied even where both parties move for pre-trial resolution." *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 (2d Cir.1983); *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). *Long Island Airports Limousine Service Corp. v. Playboy-Elsinore Associates*, 739 F.2d 101, 103 (2d Cir.1984); *accord, Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985); *Grand Union Co. v. Cord Meyer Development Corp.*, 735 F.2d 714, 717 (2d Cir.1984). If a contract is ambiguous and therefore susceptible to more than one reasonable interpretation, a genuine issue of material fact exists as to the intent of the parties at the time the contract was entered into. *Grand Union Co. v. Cord Meyer Development Corp.*, 735 F.2d at 717.

### I. *The Contract Interpretation Issues*

■ As a preliminary matter the court notes that it is not clear from the record whether Triad performed *any* services for Tumco. Mr. Khashoggi claims that he "cemented" the relationship between Tumco and Northrop through his discussions with various Northrop officials. Those Northrop officials, however, do not recall Khashoggi advocating the use of Tumco as the support services subcontractor on the Peace Hawk program. Whether Triad actually performed its contractual obligations under the agreements is obviously a "genuine issue of material fact" that would preclude granting summary judgment for either party. Fed.R.Civ.P. 56(c). However, even if the court assumes *arguendo* that Triad is entitled to compensation for services rendered, the method of calculating Triad's compensation cannot be determined from the face of the agreements and, thus, as outlined below, summary judgment must be denied.

In the course of its efforts to obtain a subcontract on the Peace Hawk project, defendant Tumco entered into two agreements with Triad. The first, more general agreement is termed a "Marketing Agreement". It essentially provides that Triad will use its best efforts to develop specific projects to be delineated in more detailed "Product Agreements", and will be compensated at a rate provided for in the individual product agreements. The second, more specific agreement is captioned "Product Agreement #1."[2] This agreement specifically relates to the "Northrop F–5 Aircraft Maintenance and Training Program as sold by Tumco as a subcontractor to Northrop under a United States Government F.M.S. Contract," i.e. the Peace Hawk program.

Both parties contend that the agreements are plain on their face and that summary judgment should therefore be granted. However, the parties' interpretations of key clauses in the contracts are diametrically opposed.

The Marketing Agreement establishes the nature of the relationship between the parties. Pursuant to the Marketing Agreement, Tumco appointed Triad as its marketing representative for the sale of "Tumco Products" on the projects delineated in the Product Agreements. Triad's compensation was defined in ¶ 2(e) of the agreement as follows:

> Compensation as used herein shall mean the consideration earned by TRIAD by reason of the performance of marketing services set forth in Paragraph 3, for which TRIAD is entitled to payment hereunder.

Under ¶ 3, Triad's marketing services were defined as follows:

> TRIAD shall devote its best efforts to the development of the specific projects agreed upon in the Product Agreement, and shall assist when requested, on any and all problems related to the successful

---

**2.** The parties actually entered into four separate product agreements. Only Product Agreement #1 is relevant to the issues before the court.

performance and conclusion of the project or contract.

TRIAD shall submit reports to Tumco no less than once a month including such of the above information as is available. It shall further give its written opinion on specific marketing matters when requested.

The agreement also provided that the actual rate of compensation would be set forth in the Product Agreements [¶ 5(a)]; that compensation would be paid on any add-ons, extensions, or supplements [¶ 5(c)]; and that the agreement would continue for five years unless terminated by either party on 60 days written notice [¶ 7]. The agreement further provided that express provisions of a Product Agreement regarding termination would supersede the Marketing Agreement's termination provision [¶ 7(c)]. The Marketing Agreement also contained a forum selection clause stating that the validity and construction of the Agreement would be governed by New York State law [¶ 13].

The Product Agreement signed by the parties relates specifically to the Peace Hawk program. The "product" covered by the agreement is support services for the Peace Hawk project. The rate of Triad's compensation is set forth in ¶¶ 6 and 7 of the Product Agreement as follows:

6. *Payment and Compensation Rate:*

(a) Marketing Compensation shall be five percent (5%) of contract price, plus a sum equivalent to one half (½) of the gross profit realized by Tumpane in the performance of the contract of sale.

\*     \*.     \*     \*     \*     \*

7. *Special Provisions*

I. The price proposal submitted to the customer shall be prepared on the following basis:

(a) Marketing Compensation shown as a line item: two percent (2%) of contract price.

(b) Balance of Marketing Compensation of three percent (3%) of contract price to be included in the basic costs.

(c) A Management Fee for TUMCO equivalent to four percent (4%) of contract price to be included in the basic costs.

(d) Line item profit shall be included at fifteen percent (15%) of costs. Should negotiations with the customer result in a profit of less than nine percent (9%) of costs, the TRIAD compensation shall be subject to negotiation between TUMCO and TRIAD.

Tumco contends that the 5% Marketing Compensation payment to Triad set forth in ¶ 6 was to be generated from the proceeds of Tumco's contract with Northrop by including 2% specifically designated "Marketing Compensation" as a line item of cost [¶ 7(I)(a)] and including the additional 3% elsewhere in various items of "basic costs" [¶ 7(I)(b)]. In addition, Tumco was also to obtain a 4% management fee from various items of "basic costs" [¶ 7(I)(c)]. Tumco contends that if its negotiations with Northrop resulted in a profit of less than 9% of cost, Triad's compensation was to be "subject to negotiation" pursuant to ¶ 7(I)(d). In other words, Tumco argues that, under ¶ 7 of the Product Agreement, it is required to pay Triad a specific compensation percentage *unless* Tumco's negotiated profit from Northrop was less than 9% of costs, in which case Triad's compensation is subject to negotiation between the parties. Tumco further argues that its final profit must be determined by taking its gross profit and subtracting its costs, which include the 5% Marketing Compensation payable to Triad and the 4% Management Fee payable to Tumco. In essence, Tumco contends that the "costs" contained in ¶¶ 7(I)(a), (b), and (c) must be subtracted "off the top" of its gross profit to determine its actual profit. Calculated this way, Tumco never realized a 9% profit in its contracts with Northrop because Northrop would not allow Tumco to include the "costs" listed in ¶¶ 7(I)(a), (b), and (c) in the Tumco-Northrop contract.

Not surprisingly, Triad's interpretation of ¶¶ 6 and 7 is somewhat different than Tumco's. Triad contends that its compen-

sation is irrevocably set by ¶ 6 and that ¶ 7 only relates to price *proposals.* Triad further contends that Tumco realized more than 9% on its contract with Northrop and, accordingly, ¶ 7(I)(d) was never triggered.

■ Both Triad and Tumco have submitted voluminous documentation to support their interpretation of the disputed contract language, but the documents, including affidavits and depositions, are clearly in conflict. Tumco cites the deposition of Mr. Khashoggi alleging that Khashoggi conceded that Tumco's interpretation of the agreement is correct. Triad cites the deposition of Mr. James J. Tumpane, Jr. alleging that Tumpane agreed with Triad's interpretation of the contracts. In this court's view, the question of the proper method of calculating Triad's compensation is not clearly unambiguous and therefore summary judgment is improper. In addition, there are a number of other contractually based issues which are in dispute. For example, Triad maintains that it is entitled to commissions on phases III, IIIE, and V because phases IIIE and V were merely extensions of the original phase III contract. Tumco contends that even if Triad is entitled to commissions on phase III, it is not entitled to commissions on phases IIIE and V as those were separate contracts. The parties also dispute which termination date governs the agreements. Where the contract language is susceptible of two fairly reasonable interpretations, the parties should be afforded an opportunity to present extrinsic evidence on the issue of their intent at the time of contracting. *Schering Corp. v. Home Insurance Co.,*

712 F.2d 4, 9 (2d Cir.1983); *Cibro Petroleum Products v. Sohio Alaska Petroleum Co.,* 602 F.Supp. 1520, 1546 (N.D.N.Y. 1985). This court cannot conclude as a matter of law that either party is entitled to summary judgment and therefore both parties' motions for summary judgment with respect to the contract interpretation issues are denied.

## II. *The Conflict of Law Issues*

■ As noted previously, the Marketing Agreement between the parties contains a forum selection clause designating New York as the jurisdiction that would govern the interpretation of the contracts. New York courts will normally honor the parties' choice of forum provided the forum selected has a substantial relationship to the parties or the transaction and the application of the forum's law would not be contrary to a fundamental policy of a state with a materially greater interest than the forum state.[3] *Business Incentives Co. v. Sony Corporation of America,* 397 F.Supp. 63, 67 (S.D.N.Y.1975); *see also Southern International Sales Co. v. Potter & Brumfield Division of AMF Inc.,* 410 F.Supp. 1339 (S.D.N.Y.1976). Thus, New York courts do not consider themselves bound by a forum selection clause if its application would override the policies of a state with a materially greater interest in the controversy. *See Keystone Leasing Corp. v. Peoples Protective Life Insurance Co.,* 514 F.Supp. 841, 847 (E.D.N.Y.1981); *Southern International Sales Co. v. Potter & Brumfield Division of AMF Inc.,* 410 F.Supp. at 1341–42; *Business Incen-*

---

**3.** The parties agree that New York's policy with regard to this issue is based on the Restatement (Second) of Conflict of Laws § 187 which reads in pertinent part:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

  (a) the chosen state has no substantial relationship to the parties or the transaction and

there is no other reasonable basis for the parties' choice, or

  (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Tumco contends that this case falls squarely within § 187(2)(b).

*tives Co. v. Sony Corp.*, 397 F.Supp. at 67; *Haag v. Barnes*, 9 N.Y.2d 554, 216 N.Y. S.2d 65, 175 N.E.2d 441 (1961).

Tumco contends that Saudi Arabia has a far greater interest in this litigation than New York does and, consequently, Saudi law should apply notwithstanding the forum selection clause. Triad contends that Saudi Arabia has no interest in this controversy and accordingly, this court should honor the parties' choice of forum.

■ In determining what law should apply, this court must weigh the relative interests of the states involved to determine which state has the greatest interest at stake in this litigation. The court must also consider which forum has the most significant relationship with the parties and transaction.

Plaintiff Triad is a Liechtenstein entity. Defendant Tumco is incorporated in New York with its main office in Vancouver, Washington. At the height of the Peace Hawk program Tumco had only two employees in New York compared with 3750 in Saudi Arabia, 500 in Montana, 250 in California, 200 in Spain, and 100 in Washington.[4] None of the relevant agreements were negotiated, executed, or performed in New York. It appears that New York's only significant contact with this litigation is via the forum selection clause contained in the Marketing Agreement.

In contrast, Saudi Arabia has a significant connection to this litigation and a compelling interest in the application of the law. Although Triad is a Liechtenstein entity, it has characterized itself as a "Saudi sales agent."[5] Its reputation as an effective marketing agent is based almost entirely on Mr. Khashoggi's purported influence in Saudi Arabia. In addition, the Northrop-Tumco contracts, which are predicates to the Triad-Tumco contracts, were

negotiated primarily in Saudi Arabia and call for performance entirely in Saudi Arabia. Moreover, Saudi Arabia has a compelling interest in having its law applied to this controversy. The Kingdom of Saudi Arabia prohibits the payment of agent's fees on contracts for arms and related services. The Saudi prohibition was formally expressed in Decree No. 1275 which was issued on September 17, 1975. The Decree prohibits the payment of any agent's fees in connection with the sale of armaments or related equipment:

1. No firm holding a contract with the Saudi Government for the supply of arms or equipment required by the Saudi Government may pay any sum as a commission to any intermediary, sales agent, representative, or broker. This prohibition shall apply regardless of the nationality of the firm or the nationality of the intermediary, sales agent, representative, or broker. It shall apply also whether the contract was concluded directly between the Saudi Government and the firm or through a third-party state. No recognition is accorded to any commission agreement previously concluded by any of such firm with any party, and such agreement shall have no validity *vis-a-vis* the Saudi Government.

2. If among the foreign firms mentioned in paragraph 1 above there are any that are obligated by commission agreements that they have made, they are to stop payment of the commissions due after having been warned by this decision. . . .

■ The Saudis enacted Decree No. 1275 in an attempt to root out corruption and bribery in military contracts. To allow a forum selection clause to circumvent this strong Saudi policy would render Decree No. 1275 meaningless. In contrast, New York has no policy at stake in this litiga-

---

**4.** Since 1954 Tumco has never had more than two New York-based employees at any given time.

**5.** The Marketing Agreement states that "Triad is and has been since 1955 an established marketing organization in Saudi Arabia with offices in Riyadh and Jeddah. . . ."

tion. New York has little or no interest in upholding Triad's claim for fees. In view of the significant connection to Saudi Arabia, the fundamental Saudi policy against agent's fees in military contracts, and the negligible relation between this case and New York, the court finds that Saudi Arabian law should apply. *Keystone Leasing Corp. v. Peoples Protective Life Insurance Co.*, 514 F.Supp. at 847; *Southern International Sales Co. v. Potter & Brumfield Division of AMF Inc.*, 410 F.Supp. at 1341–42; *Business Incentives Co. v. Sony Corp.*, 397 F.Supp. at 67; Restatement (Second) of Conflict of Laws § 187.

Under the concept of depacage, Saudi law will only be applied after September 17, 1975 as the Saudi interest in this action did not arise until Decree No. 1275 was issued.[6] There is no reason to displace the parties' choice of forum prior to the issuance of the Decree.

■ Triad argues that even if the court finds that Saudi law applies here, there is a question of fact as to whether Saudi law would prohibit enforcement of Triad's claims. Although foreign law was formerly treated as a question of fact, it is now considered a question of law for the court. Fed.R.Civ.P. 44.1, *Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir.1970); *Fleischmann Distilling Corp. v. Distillers Co.*, 395 F.Supp. 221, 231–32 n. 15 (N.D.N.Y.1975); *First National Bank of Arizona v. British Petroleum Co.*, 324 F.Supp. 1348, 1355 (S.D.N.Y.1971); *Instituto Per Lo Sviluppo Economico Dell'Italia Meridionale v. Sperti Products, Inc.*, 323 F.Supp. 630, 635 (S.D.N.Y.1971).

Triad advances five arguments in support of its position that Saudi law does not bar its claim for agent's fees. First, Triad argues that it is not an "intermediary, sales agent, representative, or broker" within

the meaning of Decree No. 1275. This argument is clearly untenable. Triad has characterized itself as a "Saudi sales agent" and the Marketing Agreement between the parties states that Tumco "appoints Triad as its representative for the sale of Tumco products in Saudi Arabia." Judge Tashima of the Central District of California recently considered this identical question in litigation involving Triad's claim for fees based on the Northrop-Triad Peace Hawk contract:

> [Triad's] interpretation is inconsistent with the circumstances surrounding adoption of the Decree, and with the plain language of the Decree itself.... It is clear that the Saudi Decree reflects a governmental policy formulated specifically with the Northrop-Triad agency relationship in mind. It stretches credibility beyond the breaking point to conclude, in this context, that the Decree was worded so as to exempt "service agents" such as Triad from its prohibitions.

*Northrop Corporation v. Triad Financial Establishment*, 593 F.Supp. 928, 939 (C.D. Cal.1984). Triad is clearly an "intermediary, sales agent, representative or broker" and thus subject to Decree No. 1275.

Triad also argues that the policy behind enactment of Decree No. 1275 is to avoid added costs in Saudi military contracts and thus, the Decree should be limited to prohibiting only agents' fees that would be passed on to the Saudi government. The Decree, however, makes no distinction between agent's fees to be passed on to the Saudi government and those to be absorbed by the parties. The Decree contains a broad prohibition on payment of any and all agent's fees in arms-related contracts. Triad also raised this argument in the *Northrop* case. Judge Tashima stated:

> While the Decree clearly reflects the Saudi government's unwillingness to be

---

**6.** Depacage has been defined as "applying the rules of different states to different issues." Reese, *Depacage: A Common Phenomenon in Choice of Law*, 73 Colum.L.Rev. 58 (1973). The court determines which law should apply with respect to each particular *issue* after weighing the appropriate choice-of-law factors. *See E. Scholes & P. Hay, Conflict of Laws,* § 2.15 at 40 (1982); *R. Weintraub, Commentary on the Conflict of Laws,* § 3.4 (2d ed. 1980).

charged for commissions paid to middlemen, that is not its sole intent or effect. The Decree also contains a broad prohibition against "go-betweens or commissions of any kind on arms contracts...." The words "No company ... shall pay," cannot fairly be construed to preclude only those commissions charged to the Saudi government; rather the Decree imposes a flat ban upon commission agreements between suppliers and agents in U.S.-Saudi arms contracts.

*Northrop Corporation v. Triad Financial Establishment*, 593 F.Supp. at 938. In this court's view Triad's interpretation of the Decree is overly narrow and not supported by the plain language of the Decree. The Decree clearly prohibits all agents' fees regardless of whether their ultimate cost is passed on to the Saudi government.

Triad next argues that Decree No. 1275 applies to contracts for the sale of arms, but not to related support services. The court finds this argument without merit. The Saudis' own interpretation of Decree No. 1275 makes it clear that it was intended to apply to sales of arms, equipment, and services as shown in this official Diplomatic Note sent to the U.S. Embassy in Jidda:

> [Decree No. 1275] ... banned payment of commissions on contracts for armaments and necessary related equipment whether the contents of such contracts were for arms, equipment or services *without any exception.* (emphasis added).

Official Diplomatic Note, dated Oct. 10, 1976.

To hold that service contracts are exempt from the Decree would be logically inconsistent since the support services are an indispensible part of an arms contract. For example, four of the eight phases of the Peace Hawk program involved support services for the Peace Hawk technicians, mechanics, pilots, and other support personnel.[7] The Peace Hawk project was clearly an integrated military contract involving the sale of arms, equipment and services to Saudi Arabia. All the phases were necessarily interrelated. The Saudis apparently recognized the danger of allowing any exceptions to Decree No. 1275. A United States Department of State telegram discussing the reach of Decree No. 1275 stated:

> Prince [then-Deputy Prime Minister Abdullah] added that no distinction could be made in any case between services/arms and equipment. *If you gave lawyers and agents that much of an opening they would confound the issue by their subtle distinctions to the point where anything would again be permitted.* He repeated again that he would not [repeat] not agree to any payments to agents, commission brokers or middlemen in connection with ... modernization program.

In this court's view the Decree was intended to apply to arms-related support services contracts.

Triad next argues that Decree No. 1275 does not apply to subcontracts. This position also finds no support in the language of the Decree. The Decree states that "there shall be no intermediation or commission *of any kind* in connection with arms contracts...." Moreover, the policy underlying the Decree, namely to eliminate the incentive for corruption in arms-related contracts, would be served by application of the Decree to subcontracts as well as prime contracts. Indeed to hold otherwise would allow parties to completely circumvent the strictures of Decree No. 1275 merely by subcontracting the majority of the contract. The Saudis were not inclined to allow exceptions to Decree No. 1275 and it is unlikely that subcontracts would be exempted from the Decree. The court finds that Decree No. 1275 applies to subcontracts as well as prime contracts.

---

**7.** Phases I, II, IV, and VI involved the sale of fighter planes and related hardware; phases III, IIIE, V, and VII involved the sale of support services.

Finally, Triad argues that Decree No. 1275 does not apply to a split of profits but only to straight commissions. This argument is also contrary to the language of the Decree which bans payment of *"any sum* as a commission." The Decree does not distinguish between commissions. included in the gross or those based on a percentage of the net; Triad's interpretation goes to the method of generating the commissions and not whether the Decree bars all commissions. There is little doubt that a payment made to a sales agent based on a split of the profits would still be considered a "commission" within the meaning of Decree No. 1275.

The court concludes that Saudi Arabian law, specifically Decree No. 1275, must be applied to this controversy. The language of the Decree states that obligated firms such as Tumco "are to stop payment of the commissions due after having been warned by this decision." The only Peace Hawk phase commenced after the issuance of the Decree is phase V.[8] Although the Decree might readily be interpreted to prohibit payment of fees for work performed prior to its issue, such retroactive application raises serious constitutional questions not heretofore briefed or put forth by the parties and which are better left for another day. Accordingly, the court grants summary judgment to Tumco dismissing Triad's claim for fees with regard to phase V.

IT IS SO ORDERED.

---

**8.** As previously noted, Decree No. 1275 was issued on September 17, 1975. Phase V of the Peace Hawk program commenced on February 16, 1976.