## NORTHROP CORPORATION, Petitioner,

v.

## TRIAD FINANCIAL ESTABLISHMENT and Triad International Marketing, S.A., Respondents.

In the Matter of the Arbitration Between
**TRIAD INTERNATIONAL MARKETING, S.A., et al., Petitioners,**

and

## NORTHROP CORPORATION, Respondent.

Nos. CV83–7945, CV83–7948.

United States District Court, C.D. California.

Sept. 4, 1984.

---

Ronald L. Olson, Jeffrey I. Weinberger, Bradley S. Phillips, William D. Temko, Munger, Tolles & Rickershauser, Los Angeles, Cal., for Northrop Corporation.

Joseph A. Ball, John R. McDonough, Joseph D. Mullender, Jr., Carole C. Rouin, Ball, Hunt, Hart, Brown & Baerwitz, Beverly Hills, Cal., for Triad International Marketing, S.A. and Triad Financial Establishment.

Harold R. Tyler, Jr., Michael B. Mukasey, Eugene M. Gelernter, Patterson, Belknap, Webb & Tyler, New York City, William D. Keller, Hahn & Cazier, Los Angeles, Cal., for amicus curiae The Tumpane Company, Inc.

## MEMORANDUM OPINION

TASHIMA, District Judge.

These are consolidated actions to, respectively, vacate and confirm an arbitration award against Northrop Corporation ("Northrop") and in favor of Triad Financial Establishment and Triad International Marketing, S.A. (collectively "Triad"). Arbitration was initiated by Triad in 1979. After lengthy proceedings involving Triad's claims to approximately $153 million in commission payments, the arbitration tribunal (the "tribunal") made an award to Triad in the amount of $31,477,378.

## BACKGROUND

### The Marketing Agreement

On October 4, 1970, in an effort to facilitate the sale by Northrop of fighter aircraft and related equipment to the Kingdom of Saudi Arabia,[1] Northrop and Triad executed a Marketing Agreement (the "Agreement"). The Agreement designated Triad as Northrop's sole representative for the sale of certain specified products and services in Saudi Arabia. Triad was to be paid a commission on consummated sales at a rate varying according to the type of sale and with subsequent agreements between the parties. Direct sales by Northrop to Saudi Arabia were to be compensated at a fixed percentage of the contract price.

The Agreement also contemplated "indirect" sales. These were sales effected through the United States government, which were governed by the Foreign Military Sales Act (now the Arms Export Control Act), 22 U.S.C. § 2751, et seq. ("FMS sales" or "indirect sales"). For each FMS sale, Northrop would submit to the United States Department of Defense ("DOD") a

---

1. Saudi Arabia first announced its intention to upgrade its Air Force in the mid-1960s. In 1969, after a failed attempt to sell its F-5 and F-5B aircraft, Northrop sought out a local representative to aid it in its effort to sell aircraft to Saudi Arabia. Northrop conducted a survey of middle east sales representatives and selected Adnan Kashoggi, a principal owner of Triad.

"not-to-exceed" price proposal which would serve as the basis for a "Letter of Offer" from DOD to the Government of Saudi Arabia. This offer, once accepted by Saudi Arabia, would be returned to DOD as a "Letter of Offer and Acceptance" ("LOA"). Northrop and DOD then would execute a detailed fixed-price contract which would establish the final cost to Saudi Arabia of the program covered by the LOA.

Indirect sales were to be compensated at a rate agreed upon by the parties, but not less than one percent of the sales price. The Agreement further provided that commission payments on indirect sales were "subject to the allowability and recognition of such compensation by the United States government."[2]

The Agreement was to continue for a period of one year, and to be extended automatically for an additional five-year period if Northrop procured a contract prior to October 4, 1971.[3]

Beginning in 1971, Northrop entered into a series of contracts with the Saudi government, in what came to be known as the "Peace Hawk Program" ("Peace Hawk" or the "Program"). Northrop made FMS sales of aircraft to the Royal Saudi Air Force ("RSAF") under Phases I, II, IV and VI of the Program, and sold maintenance, construction, training and other support services and material under Phases III, III Extension ("IIIE"), V and VII of the Program. Sales to Saudi Arabia under Peace Hawk Phases I through VII totalled $4.2 billion.

*FMS Sales*

Prior to April 1972, the Saudi government had signed LOAs for Peace Hawk Phases I, II and III. Each LOA contained line items for commission payments to Triad. The amount of commissions for Phases I, II and III also were "recognized and allowed" by DOD as an element of the contract price paid to Northrop by the United States government.[4]

By August 1975, Phases I and II of the Program were completed, and Phase III was nearing completion. In an amendment to the Agreement executed on August 15, 1975, the parties established a schedule for payment by Northrop of all Triad fees earned under Phases II and III.[5] The amendment provided for payment of commissions on May 10, August 10, and November 10, 1975. The May and August commissions were in fact paid by Northrop on August 20. The commissions due on November 10, 1975, were never paid. Northrop denied liability for any outstanding Phase II or Phase III commissions; the issue was submitted to the tribunal for its resolution.

Northrop's Phase IV price proposal to DOD included line items for commission payments to Triad. However, DOD never advised Northrop that the Phase IV commissions had been "recognized and allowed." Nor did DOD include line items for commission payments on the Phase IV LOA signed by the Saudi government on January 4, 1975. Nevertheless, on April 10, 1975, Northrop and Triad signed an advance commission agreement under which Northrop paid $6 million to Triad

---

2. The Agreement, ¶ 2(g), provided:

   In the event of such [indirect] sales, if permitted by United States law, Northrop shall pay Triad such compensation as the parties shall agree, but no less than one percent (1%) of the sales price, subject to the allowability and recognition of such compensation by the United States government.

3. Northrop procured its first contract prior to October 4, 1971, and the Agreement was extended to October 4, 1976. A Second Amended Marketing Agreement was entered into on April 14, 1972, containing the same basic provisions, but expanding the product coverage.

4. Following Saudi acceptance of the Phase III LOA, DOD approval of Phase III commissions was withheld pending an investigation by the U.S. Air Force ("USAF") into the nature of the payments. Although DOD allowed Phase III commissions in excess of $5.5 million, the USAF advised Northrop that advance approval of agents' commissions included in FMS sales contracts would in the future require the express written consent of the foreign government in question.

5. Phase I commissions have been paid and are not here in issue.

against commissions which might become due under Phase IV. The agreement also provided that Phase IV commissions would not be subject to recognition and allowance by the U.S. government.

No Phase IV commissions, other than the $6 million advance, were ever paid. In the arbitration proceedings Triad claimed additional commissions on certain Phase IV FMS sales; Northrop counterclaimed for recovery of the $6 million advance commission payment.

*Termination of the Marketing Agreement*

DOD submitted its Phase V Letter of Offer to the Saudi government in January 1975. On March 6, 1975, Assistant Secretary of Defense Robert Ellsworth wrote to Prince Sultan, Minister of Defense and Aviation for Saudi Arabia, stating that Northrop's Phase V proposal included commission payments to Triad of approximately $45 million. In a written response dated May 17, 1975, Prince Sultan advised DOD that the proposed Phase V commissions were unacceptable and that the use of intermediaries with respect to arms sales to the Saudi government would not be permitted. Thereafter, the Director of the Defense Security Assistance Agency advised Prince Sultan that $23 million in Triad commissions had been included in the Phase IV LOA. By letter dated June 10, 1975, Prince Sultan reiterated his non-acceptance of any intermediary with respect to arms sale contracts and stated that the Saudi government would not allow Phase IV commission payments.

On June 10, 1975, the USAF advised Northrop that it would not be permitted to include commission payments in its Phase IIIE[6] or Phase V price proposals. On June 14, the Saudi Ministry of Defense and Aviation ("MODA") issued a public proclamation referring explicitly to the Northrop-Triad relationship and stating that the government would not permit the payment of commissions to agents in arms sale con-

tracts. On June 20, 1975, the USAF advised Northrop that agent's fees and commissions would not be recognized and allowed on Phase IV.

On July 9, 1975, DOD amended its Defense Department circular relating to agent's fees to require every supplier acting under contract with DOD for sales to Saudi Arabia and three other countries, to certify that its FMS contract price did not include any direct or indirect costs for agent's fees not approved in writing by the purchasing country. By letter dated July 28, 1975, Northrop terminated the Agreement with Triad. In so doing, Northrop stated that the U.S. government had interpreted the letters and statements of the Saudi government as an absolute prohibition against agents' fees or commissions in FMS sales. Triad refused to agree to termination of the Agreement. Only after the Saudi government signed a Phase IIIE LOA containing a specific prohibition against the payment of fees or commissions, did Triad agree, on August 15, 1975, to terminate the Agreement as to Phase IIIE.

*The Saudi Decree*

On September 17, 1975, the Council of Ministers of Saudi Arabia issued Decree No. 1275 (the "Saudi Decree"), which provides, in part:

*First:* No company under contract with the Saudi Arabian Government for the supply of arms or related equipment shall pay any amount as commission to any middleman, sales agent, representative, or broker irrespective of their nationality, and whether the contract was concluded directly between the Saudi Arabian Government and the company or through another state. Any commission arrangement already concluded by any of these companies with any other party shall be considered void and not binding for the Saudi Arabian Government;

*Second:* If any of the foreign companies described in Article I (one) were found to

---

6. Phase IIIE was proposed by DOD as an extension of Phase III. A Phase IIIE LOA, signed by Saudi Arabia on August 14, 1975, contained a clause imposing a total ban on the payment of commissions in connection with the Phase IIIE project.

have been under obligation for the payment of commission, payment of such commission shall be suspended after notifying the concerned companies of this decision. Relevant commissions shall be deducted from the total amount of the contract for the account of the Saudi Arabian Government.

Northrop sought no further services from, and made no payments to, Triad after September 17, 1975. The Saudi prohibition, as expressed in Decree No. 1275, was incorporated in a Phase V contract between DOD and Northrop, executed in March of 1976. No fees or commissions were included in any subsequent LOA signed by the Saudi government, and each LOA required Northrop to certify that the compensation paid to a marketing agent would not be claimed as an allowable item of cost and would not be included in the contract price.

*The Arbitration Award*

Pursuant to the arbitration provision of the Agreement, Triad filed its Demand for Arbitration on July 31, 1979, claiming commissions owed by Northrop. Northrop counterclaimed for Phase IV commissions advanced to Triad prior to DOD's refusal to allow such commissions. Northrop asserted as a defense to Triad's claims that the Saudi Decree bars any commission payments by Northrop to Triad and that any payment by Northrop to Triad might subject Northrop to prosecution under the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd–1, *et seq.*, enacted in 1977.

In its Decision as to Liability in the First Stage of Bifurcated Proceedings ("First Decision"), the tribunal found Northrop liable for commission payments on Peace Hawk Phases II, III and IV. In so holding, the tribunal rejected Northrop's contention that the Saudi Decree rendered payment of commissions illegal under California law.[7]

The tribunal further held that payment of commissions agreed to and earned prior to 1977 would not subject Northrop to possible prosecution under the FCPA. However, the tribunal found that, under the allowability and recognition clause of the Agreement, Triad had assumed the risk that the U.S. government would not approve commission payments. Thus, Triad was not awarded commission payments which were not allowed by DOD. This included payments under Phase IIIE, V and thereafter. With respect to Phase IV, the tribunal found that Northrop had waived the Agreement's proviso and therefore was obligated to pay all commissions despite the absence of DOD approval. The tribunal denied Northrop's counterclaim for Phase IV advance commission payments.

In May 1983, the tribunal issued its Decision on Factual and Legal Issues Presented in Second Stage of this Proceeding ("Second Decision"), in which the amount of damages was assessed. During the course of second stage proceedings, Triad asserted additional claims for housing constructed by Northrop pursuant to a USAF—Northrop contract executed in September 1977 in Peace Hawk Phase V. Early in 1973, Northrop and Triad had executed Product Agreement No. 5,[8] which provided for commission payments on contracts for the construction of RSAF housing cantonments. The tribunal found that certain housing constructed during Peace Hawk Phase V constituted housing cantonments within the meaning of Product Agreement No. 5, and that Product Agreement No. 5 was not subject to the Agreement's recognition and allowability clause. Accordingly, the tribunal awarded Triad commissions earned on the Phase V housing construction contract.

Northrop seeks to vacate the tribunal's award on the ground that: (1) the legality

---

7. The Agreement, ¶ 13, provides that "The validity and construction of this Agreement shall be governed by the laws of the State of California in the United States of America." The applicable law is discussed, *post.*

8. This agreement became effective on January 1, 1973 and was to "cover and be applicable to

the contract for cantonments for the Royal Saudi Air Force ... to be constructed at Taif and Dhahran," regardless of whether such construction was designated as a part of the Peace Hawk Program or part of a separate U.S.-Saudi contract.

and enforceability of the Agreement involve legal issues affecting "fundamental public interests" and, therefore, were not arbitrable; and (2) even if the legality and enforceability of the Agreement were arbitrable, the tribunal's decision was contrary to law and public policy and must be overturned.

## DISCUSSION

### Arbitrability of the Dispute

■ Both parties maintain that arbitrability of the Agreement is to be determined by reference to federal law. The United States Arbitration Act ("Arbitration Act"), 9 U.S.C. § 1 et seq., "create[s] a body of federal substantive law" which governs the standards for enforcement of an arbitration award with respect to "a contract evidencing a transaction involving commerce." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 400, 87 S.Ct. 1801, 1804, 18 L.Ed.2d 1270 (1967); Mediterranean Enter., Inc. v. Ssangyong Corp., 708 F.2d 1458, 1463 (9th Cir.1983). However, the Court of Appeals for the Second Circuit recently held that the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 9 U.S.C. § 201 et seq., was applicable to an arbitral award made in the United States, but involving two foreign entities. Bergesen v. Joseph Muller Corp., 710 F.2d 928 (2d Cir.1983).[9] At least one court has held that questions concerning enforceability of arbitration agreements are governed by

federal law, whether the action arises under the Arbitration Act, or the Convention. Matter of Ferrara S.p.A., 441 F.Supp. 778, 780 n. 2 (S.D.N.Y.1977), aff'd, 580 F.2d 1044 (2d Cir.1978). As noted in Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974):

> The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries. [Citations omitted.]

Since both the Arbitration Act and the Convention reflect policy considerations favoring enforcement of agreements to arbitrate commercial disputes, see Scherk, 417 U.S. at 510–11, 94 S.Ct. at 2452–53; Matter of Ferrara, 441 F.Supp. at 780 n. 2, the legality and enforceability of the subject arbitration award may be determined by reference to federal law.

Northrop asserts that the tribunal exceeded its authority by deciding legal issues affecting fundamental public interests, and that arbitration is an inappropriate forum in which to decide statutory or public policy. Specifically, Northrop challenges the tribunal's authority to construe United States policy as announced by DOD in statements and publications, and as codified by Congress in the FCPA; and Saudi policy as promulgated in the Saudi Decree.[10]

---

**9.** The court in Bergeson stated:
> We adopt the view that awards "not considered as domestic" denotes awards which are subject to the Convention not because made abroad, but because made within the legal framework of another country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction.

710 F.2d at 932. Here, although Northrop is a California corporation having its principal place of business in Los Angeles, Triad Financial Establishment is a Liechtenstein establishment, and Triad International Marketing is a Liechten-

stein corporation. Thus, it is possible that the subject arbitration is governed both by the Arbitration Act and by the Convention. Id. at 934.

**10.** Both the Arbitration Act and the Convention permit a reviewing body to refuse recognition or enforcement of an arbitral award which is contrary to public policy. See Scherk, 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14. In applying the "contrary to public policy" standard I do not reach the issue whether the Northrop-Triad dispute is governed by the Arbitration Act or by the Convention.

■ The Arbitration Act was "designed to allow parties to avoid 'the costliness and delays of litigation,' and to place arbitration agreements 'upon the same footing as other contracts ....' " *Scherk,* 417 U.S. at 510–11, 94 S.Ct. at 2453. Thus, § 2 of the Act, 9 U.S.C. § 2, provides that arbitration agreements subject to its provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

■ However, the arbitrator's central role is to "effectuate the intent of the parties rather than the requirements of enacted legislation." *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 56–57, 94 S.Ct. 1011, 1024, 39 L.Ed.2d 147 (1974). Thus, in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Court declined to apply the Act's provisions where enforcement of an arbitration agreement would deprive a defrauded purchaser of a remedy under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2). *Wilko* has been followed in a number of other areas where public policy is implicated. *See, e.g., Allegaert v. Perot,* 548 F.2d 432 (2d Cir.), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977) (arbitration agreement unenforceable against trustee in bankruptcy alleging violations of the Bankruptcy Act); *American Safety Equip. Corp. v. J.P. Maguire & Co.,* 391 F.2d 821 (2d Cir. 1968) (courts, not arbitration proceedings, are the proper forum for resolution of antitrust claims); *Alexander v. Gardner-Denver Co.,* 415 U.S. at 56, 94 S.Ct. at 1023 (arbitration is an inappropriate forum for the resolution of rights created by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*).

■ The court in *Scherk* carved out an exception to *Wilko* in a contract dispute between an American manufacturer and a German citizen whose companies were organized under the laws of Germany and Lichtenstein. The parties agreed to arbitrate disputes arising out of the contract in proceedings to take place in Paris, and to be governed by Illinois law. Respondent sought relief in federal court under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), for alleged fraudulent representations concerning the status of trademark rights. The Court distinguished *Wilko* on the ground that the contract in question was a "truly international agreement" in which potential international conflict of laws problems might arise.[11]

A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.

417 U.S. at 515–16, 94 S.Ct. at 2455. Here, as in *Scherk,* the parties are involved in a "truly international agreement" to which the applicability of a particular country's law or public policy is uncertain. Enforcement of the Agreement's arbitration clause effectively promotes the orderly resolution

---

**11.** With respect to the international nature of the agreement, the Court in *Scherk* noted:

The negotiations leading to the signing of the contract took place in the United States, England, and Germany, and involved consultations with legal and trademark experts from each of those countries and from Liechtenstein. Finally, and most significantly, the subject matter of the contract concerned the sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets.

417 U.S. at 515, 94 S.Ct. at 2455. Here, the parties are organized under the laws of the United States and Liechtenstein, respectively. Triad's president, Adnan Kashoggi, is a citizen of Saudi Arabia. Negotiations on various phases of the Peace Hawk Program took place in the United States, while the contract was performed largely in Saudi Arabia, and payments under the Agreement were made in both the United States and Switzerland.

of the parties' contractual dispute. The *Wilko* exception to the Arbitration Act, therefore, is inapplicable.[12]

### Standard of Judicial Review

It must next be determined whether the dispute, though properly submitted to arbitration, was resolved in accordance with law. The parties initially dispute the applicable standard by which the tribunal's decision is to be reviewed.

Triad maintains that the Court must defer to any decision which "draws its essence" from the marketing agreement, *USW v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), "notwithstanding the erroneousness of any factual findings or legal conclusions, absent a manifest disregard of the law." *George Day Constr. Co.*, 722 F.2d at 1477. However, it has repeatedly been recognized that a court may not enforce an award which is contrary to law and public policy. *See W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *George Day Constr. Co.*, 722 F.2d at 1477; *Broadway Cab Coop., Inc. v. Teamster & Chauffeurs Local Union 281*, 710 F.2d 1379 (9th Cir.1983).

In determining whether an arbitrator's award is contrary to law and public policy, the court is not constrained by the traditional deferential standard set forth in *Enterprise Wheel*. In *Broadway Cab*, the Ninth Circuit held that deference is unwarranted where an arbitrator's decision is challenged as violative of Supreme Court precedent. 710 F.2d at 1383. Judicial deference is similarly unwarranted where, as here, the public policy in question involves DOD regulations,[13] a foreign government's decree, and a federal statute (the FCPA). Thus, I examine *de novo* the arbitrator's decision with respect to the alleged unenforceability of the Agreement on public policy grounds.[14]

### Illegality Under Local Law

In reaching its decision, the tribunal considered and rejected Northrop's contention that enforcement of the Agreement was illegal under California law. Cal.Civ.Code § 1511 provides that performance of an obligation is excused "[w]hen such performance ... is prevented ... by the oper-

---

12. Triad also asserts that Northrop waived its right to challenge the jurisdiction of the tribunal by voluntarily submitting the dispute to arbitration. *See George Day Constr. Co. v. United Bhd. of Carpenters*, 722 F.2d 1471, 1476 (9th Cir. 1984). Northrop denies this assertion. Because I conclude that the dispute was arbitrable, I do not decide whether Northrop waived its right to an independent judicial determination on the issue of arbitrability.

13. Triad maintains that the Saudi Decree had no counterpart in federal law or U.S. public policy. However, it is clear that DOD wished to conform its policy precisely to that announced by Saudi Arabia. For example, a DOD proposed amendment to the Peace Hawk Phase IIIE Letter of Offer would have required Saudi approval even of agent's fees paid by Northrop but *not* charged to the Saudi government. (No such fees were approved.) Communications between Northrop and DOD subsequent to Prince Sultan's initial rejection of agents' fees in U.S.-Saudi arms contracts all indicated that agents' fees would "not be allowed" in additional Peace Hawk Phases. DOD's revised Defense Procurement Circular, issued July 9, 1975, provided that suppliers acting under contract to DOD would henceforth be required to certify that their FMS contract price did not contain any costs for agent's fees not approved in writing by the purchasing country (including Saudi Arabia). DOD actions taken with respect to suppliers in arms sale contracts clearly reflected a policy of adherence to the prohibitions of the Saudi Decree.

The Fifth Circuit held, in a breach of contract action governed by California law, that the government's informal priorities policy ("jawboning") came within the excusable delay provision of a lease agreement. *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957 (5th Cir.1976). Concluding that a voluntarily acquiesced-in policy could constitute an "act of government, governmental priority, allocation regulation or order" within the meaning of the contract's excusable delay clause, the court held that the jawboning issue should have been submitted to the jury. DOD's enforcement of Saudi policy was coercive rather than voluntary, and is properly characterized as U.S. public policy.

14. Since a court ordinarily must defer to an arbitrator's legal as well as factual conclusions, it should be stressed that the court undertakes *de novo* review only of that portion of the tribunal's decision which is alleged to be contrary to law and public policy.

ation of law.... " Northrop asserts that the Saudi Decree prevented performance of the Agreement within the meaning of § 1511, and that payment of commissions claimed by Triad therefore is excused. The tribunal relied primarily upon two cases decided under California law in which governmental action of a foreign state prevented performance of a contract. Appellant in *Baird v. Wendt Enter., Inc.*, 248 Cal. App.2d 52, 55, 56 Cal.Rptr. 118 (1967) was not entitled to damages for breach of a contract whose performance had been "made impossible by operation of law ...." Respondent's performance was excused, within the meaning of § 1511, by the State of Hawaii's refusal to furnish a building permit under a building code enacted after execution of the contract. In *Johnson v. Atkins*, 53 Cal.App.2d 430, 127 P.2d 1027 (1942), the buyer was excused from performance of a contract to purchase copra for shipment to Columbia when, after execution of the contract, Columbia banned further importation of copra. The tribunal read *Baird* and *Johnson* to require *factual* impossibility in order to fall within the "prevention by operation of law" standard.

> In neither [*Baird* nor *Johnson* ] did the California court undertake an examination of the law and decisions of the other state or country to determine how it would decide the question presented. Instead, the court simply looked at whether on the face of things the governmental action had in fact prevented performance of the contract in question.

First Decision at 24. Applying a factual impossibility standard to the facts at hand, the tribunal found "no comparable governmental action."

> It may be that promulgation of Decree 1275 created problems for Northrop and Triad in that they possibly would have some difficulties with the government of Saudi Arabia as a result of not complying with Decree 1275. However, that decree did not make performance of the Marketing Agreement impossible. It still was perfectly possible for Northrop to make payments of compensation to Triad pursuant to the contrast [sic]. It

also would have been possible for Triad to give advice to Northrop, ... and to do the other services called for by the Marketing Agreement. We cannot look at Decree 1275 and on its face find resulting impossibility of performance as the California courts did in *[Baird]* and *Johnson*. The decree did not produce impossibility of performance under § 1511.

*Id.*

■ The tribunal's interpretation of California law is untenable. Performance prevented by the "operation of law" within the meaning of § 1511 need not be factually impossible. Neither *Baird* nor *Johnson* supports such a conclusion. California law does not require a party to violate the law of a foreign jurisdiction in order to avoid liability for breach of contract. *Industrial Dev. & Land Co. v. Goldschmidt*, 56 Cal. App. 507, 206 P. 134 (1922), is illustrative. Plaintiff in *Goldschmidt* leased certain property to defendants for the purposes of running a liquor business. When, prior to expiration of the lease, the Prohibition Amendment was adopted, the lessees were excused from any further obligations under the lease since the business for which the land had been leased had become unlawful. Performance of the contract became illegal.

> [A] contract which contemplates the doing of a thing which is unlawful at the time of the making thereof is void. For the same reason a contract which contemplates the doing of a thing, at first lawful but which afterward and during the running of the contract term becomes unlawful, is affected in the same way and ceases to be operative upon the taking effect of a prohibitory law.

*Id.* at 509, 206 P. 134. The "operation of law" defense set forth in § 1511 is equally applicable to a foreign law. *See Baird, Johnson, supra.* It therefore must be determined whether the effect of the Saudi Decree was to prevent performance of the Agreement within the meaning of § 1511.

### Illegality Under Saudi Law

Triad asserts that Saudi law does not preclude payment of commissions owed it

by Northrop. This assertion is premised upon an interpretation of the Saudi Decree which would (1) permit the payment of commissions which are not charged to the Saudi government; and (2) exempt "full service" agents such as Triad from the Decree's prohibition.

Beginning in March 1975, DOD sought approval from the Saudi government for agent's fees included in certain phases of the Peace Hawk Program. In response to each DOD inquiry, Prince Sultan indicated that the proposed commissions would not be accepted by Saudi Arabia. Triad relies on the wording of Saudi-DOD communications, and on conversations which took place in June 1975, between Prince Sultan and Northrop and Triad officials, to support its claim that the Saudi government rejected *only* those commissions charged to the Saudi government, and not fees paid by Northrop which were not passed on to Saudi Arabia through an LOA.[15] However, the wording of both inter-governmental communications and the Saudi Decree clearly extends the Saudi prohibition beyond mere inclusion of commissions in the Saudi contract price. In letters dated May 17 and June 10, 1975, Prince Sultan stated unequivocally that the Saudi government dis-

approved not only the payment of commissions by suppliers to agents, but also the use of any middleman in U.S.—Saudi Arabia arms contracts.[16]

The Saudi Decree similarly prohibits any commission arrangement between arms suppliers and "any middleman, sales agent, representative, or broker .... " The Decree also provides that existing obligations for the payment of commissions "shall be suspended," and that "Relevant commissions shall be deducted from the total amount of the contract for the account of the Saudi Arabian Government." While the Decree clearly reflects the Saudi government's unwillingness to be charged for commissions paid to middlemen, that is not its sole intent or effect. The Decree also contains a broad prohibition against "go-betweens or commissions of any kind on arms contracts .... "[17] The words "No company ... shall pay," cannot fairly be construed to preclude only those commissions charged to the Saudi government; rather, the Decree imposes a flat ban upon commission agreements between suppliers and agents in U.S.—Saudi arms contracts.

Triad next asserts that it is not an "intermediary, sales agent, representative or bro-

---

**15.** In June 1975, Thomas C. Barger, a member of the Executive Committee of Northrop's Board of Directors, met with Prince Sultan in Saudi Arabia. At the arbitration proceedings Barger testified that Prince Sultan stated that "he had nothing against agents as such ..." but that "if the company wanted to have agents, it should pay for them itself and not charge the government." R.T. x:1628–1629. Kashoggi similarly stated in deposition testimony that Prince Sultan informed him, at a meeting on June 10, 1975, that so long as commissions were not charged to Saudi Arabia, "[i]t was not his business to interfere in commercial contracts between Saudi Companies and Foreign Companies." Kashoggi Depo., 13, 15.

**16.** In response to DOD's inquiry concerning Phase V commissions, Prince Sultan stated:

"[A]s soon as I received your letter I informed the American Ambassador to the Kingdom and the Chief of the American Military Mission of my utter rejection of [the proposed $45 million] commission *and my complete nonacceptance of any middleman, no matter who or from where he happens to be, in any*

*arms contract between the Kingdom of Saudi Arabia and the Government of the United States of America.*" (Emphasis added.)

With respect to Phase IV commissions, Prince Sultan wrote:

"We would like to inform you that the Saudi Arabian Government does not approve of such payments and absolutely will not permit them. Further, I would like to remind you of what was contained in my letter to [Assistant Secretary of Defense] Ellsworth dated May 17, 1975, concerning the *non-acceptance of any intermediary regardless of his nationality or regardless of which party he represents for any arms contract between the Saudi Arabian Government and the United States Government.*" (Emphasis added.)

**17.** The preamble to the Saudi Decree provides, in part:

"The Council of Ministers, ... in confirmation of Saudi regulations banning intermediaries in contracts and any illegitimate payments, and in line with the government's policy that there will be no go-betweens or commissions of any kind on arms contracts, ... Decides as follows ...."

ker" within the meaning of the Saudi Decree, but instead performs a broad range of services not typically provided by a middleman or marketing representative.[18] As such, Triad claims to be exempt from the prohibition of the Saudi Decree.

This interpretation is inconsistent with the circumstances surrounding adoption of the Decree, and with the plain language of the Decree itself. Prince Sultan initially addressed the issue of agent's fees on May 17, 1975, in response to a DOD inquiry concerning the inclusion of Triad commissions in a Phase V Letter of Offer. On June 10 Prince Sultan expressed his disapproval of "such [commission] payments" and "non-acceptance of any intermediary," in response to a DOD inquiry concerning the inclusion of Triad commissions in a Phase IV LOA. Shortly thereafter, on June 14, 1975, MODA issued a public proclamation reiterating its rejection of intermediaries in arms contracts, and referring explicitly to Northrop's agency relationship with Triad.[19] The June 14 proclamation is cited in the preamble to the Saudi Decree, which makes reference both to official statements and MODA's letters to DOD "disapproving brokerage and payment of commissions on arms contracts ...."

It is clear that the Saudi Decree reflects a governmental policy formulated specifically with the Northrop-Triad agency relationship in mind. It stretches credibility beyond the breaking point to conclude, in this context, that the Decree was worded so as to exempt "service agents" such as Triad from its prohibitions.[20]

Finally, Triad asserts that the Agreement is valid under the "general law" of Saudi Arabia, which binds Northrop and Triad to carry out their contract in good faith.[21] Triad additionally maintains that even if the Decree were construed to apply to some or all of Triad's claims, a Saudi court would nevertheless enforce the Agreement, leaving it to other Saudi authorities to deal with the consequences of a violation of the Decree.

These assertions are controverted by Northrop's expert witnesses.[22] Moreover, even if Saudi general law were as contend-

**18.** Triad's expert witness, Samir Shamma, testified at the arbitration proceedings that the broad range of services performed by Triad renders it a "service agent," a category of business enterprise not included in any of the Arabic words which are translated as "intermediary, sales agent, representative, or broker," within the meaning of the Saudi Decree.

The services performed by Triad, which are not typically performed by an intermediary, sales agent, representative or broker include: (1) providing the client with information concerning the kind of projects within Saudi Arabia which are within a client's field of products and services; (2) working with a client to establish a marketing strategy for an available product; (3) assisting the client in preparing a proposal or bid; (4) assisting in communication between the client and Foreign Ministry personnel; and (5) assisting the client, once a contract is awarded, in obtaining logistic support within the foreign country, letters of credit and work visas for the client's personnel.

It was Shamma's testimony that the Saudi Decree was aimed at an entirely different category of business enterprise, whose functions do not encompass any of the great variety of services provided by Triad.

**19.** The MODA proclamation provided, in part: "On the occasion of recent news agency reports about the payments by the American

Northrop Corporation to its agent, the Triad Financial Corporation, ... the Ministry of Defense and Aviation wishes to make clear [that] ... [t]he Government has been making sure that there should be no intermediaries or beneficiaries of these arms contracts. If some companies have been paying commissions to agents in return for real or imaginary services, the Government of Saudi Arabia is unaware of such payoffs, did not approve of them and will not tolerate them."

**20.** Northrop's expert witness, Fathi Hussein, testified at the arbitration proceedings that Triad was an "intermediary, sales agent, representative or broker" within the meaning of the Decree, noting that the Agreement specifically refers to Triad as Northrop's "representative," and provides that Triad's compensation is to be in the form of commissions. R.T. x:1472, 1516–17, 1520, 1558–60.

**21.** Shamma testified that the principle of "ibaha" or freedom of contract is a basic tenet of "Shari'a" (Islamic) law, and requires that parties fulfill their contractual obligations even though such obligations violate a Council of Ministers' decree.

**22.** Hussein testified that Shari'a law provides that the Ruler may issue rules and regulations

ed by Triad, California law would not permit the result urged by Triad to obtain. As noted, Cal.Civ.Code § 1511 excuses performance which is prevented by operation of law. Application of § 1511 cannot logically be limited to those situations in which performance is prevented by court order.

■ There is ample evidence from which to conclude that the Saudi Decree prevented performance of Phases IIIE, IV and V of the Agreement within the meaning of § 1511.[23] Therefore, that portion of the tribunal's award based upon claims which are violative of the Saudi Decree must be vacated. The Saudi Decree, however, did not prevent performance with respect to the $6 million advance commission payment under Phase IV. This payment was made well before the Saudi Decree was promulgated. Although the record before the tribunal indicates that virtually no Phase IV commissions were earned until after September 1975, the Decree, on its face, does not require reimbursement of commissions already paid. Under these circumstances,

to regulate the life of the changing society, and that nothing in Shari'a law prevents the issuance of laws proscribing certain conduct or transactions, even if such laws limit the principle of "ibaha" or freedom of contract. Hussein also testified that the contractual dispute between Northrop and Triad would be heard in the Saudi Board of Settlement of Commercial Disputes, a commercial court set up to enforce laws and regulations enacted by the King or by the Council of Ministers, and that the Board of Settlement would in all likelihood enforce the prohibitions of the Decree. R.T. x:1466–67, 1490, 1568. Zaki Mustafa, another expert witness for Northrop who is a law partner of Hussein, stated in his affidavit that the Decree would be considered by any Saudi court to be a complete defense to any commissions claimed under the Agreement.

23. Northrop argues, in the alternative, that even if California law does not prohibit payment of commissions claimed by Triad, the parties' contractual choice of law will not be enforced where:

application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties.

the Court declines to disturb the tribunal's award, denying recovery on Northrop's counterclaim.

### The Foreign Corrupt Practices Act

■ Northrop additionally asserts that the FCPA prohibits enforcement of the tribunal's award. The FCPA was enacted in 1977 in response to reports by the Securities and Exchange Commission ("SEC") concerning widespread corporate bribery of foreign officials.[24] In general terms, the FCPA criminalizes foreign corporate bribery. See 15 U.S.C. § 78dd–1(a). It was Northrop's contention at the arbitration proceedings that, prior to enactment of the FCPA, Triad promised to bribe and bribed Saudi officials for the purpose of influencing their decisions concerning the Peace Hawk Program and to obtain business for Northrop. Northrop maintained that a pre-FCPA promise made to a foreign official to secure an award of a contract at that time would constitute a violation of the FCPA. First Decision at 13.

Restatement (Second) of Conflicts, § 187(2)(b). California has adopted the Restatement rule. See Ashland Chem. Co. v. Provence, 129 Cal. App.3d 790, 794, 181 Cal.Rptr. 340 (1982); S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co., 641 F.2d 746, 749–50 (9th Cir.1981), rev'd on other grounds, — U.S. —, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Although it need not be determined here whether the Restatement rule requires application of Saudi law, the evidence supports the conclusion that enforcement of Triad's claims would violate a fundamental policy of Saudi Arabia and that Saudi Arabia has a materially greater interest in determining whether enforcement of Triad's claims would contravene the express prohibitions of the Saudi Decree.

24. The Senate Committee, in support of the criminalization of foreign corporate bribery, noted:

"The serious abuses which the [SEC] has uncovered justify an explicit congressional affirmation of our national commitment of ending corrupt foreign payments. While the [SEC] has made substantial progress in its enforcement program, the committee believes that legislation is appropriate to make clear that cessation of these abuses is a matter not merely of SEC concern, but of national policy."
S.Rep. No. 114, 95th Cong., 1st Sess. 3, reprinted in 1977 U.S.Code Cong. & Ad.News 4098, 4101 and 4107.

The tribunal concluded that the FCPA did not apply to a promise or offer of payment made prior to the statute's enactment:

> For the statute to apply the payment must be made after the law became effective to a person who at the time is a foreign official and it must be made to induce that official to use his influence with the foreign government to cause it then to award a contract to the payor or to persuade the government to permit payor to retain business with it which it then has.[25]

First Decision at 15. I similarly conclude that the prohibitions of the FCPA are prospective only. Nothing in the wording of the statute or its legislative history suggests that Congress intended the FCPA to be applied retroactively. Even were such intent present, the criminalization of pre-FCPA conduct would face serious constitutional barriers.

■ The Constitution's Ex Post Facto Clause, Art. I, § 9, cl. 3, forbids the retroactive application of a statute to penalize conduct which was innocent when done. *See Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977); *United States v. Campanale*, 518 F.2d 352, 364–65 (9th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). Similarly, "Due process requires that a person be given fair notice as to what constitutes illegal conduct so that he may conform his conduct to the requirements of the law." *United States v. Dahlstrom*, 713 F.2d 1423, 1427 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). *See also, Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); *United States v. Goodheim*, 651 F.2d 1294 (9th Cir.1981).

■ The record contains no evidence that Northrop engaged in conduct which was illegal under United States law prior to enactment of the FCPA. Because enforcement of claims based upon pre-1977 promises or payments by Triad to Saudi officials would not expose Northrop to possible prosecution under the FCPA,[26] the FCPA does not prohibit enforcement of the tribunal's award.

---

**25.** The tribunal found evidence that in 1971 and 1972 Triad promised to distribute bribes to General Hashim, then head of the RSAF, and to Hashim's successor, General Zuhair, in order to further the award of a Phase III contract to Northrop. Northrop advanced $450,000 to Triad for this purpose, $250,000 of which was paid to General Hashim. First Decision at 15–16.

In addition to rejecting the position that the FCPA applies retroactively to pre-FCPA conduct, the tribunal noted:

> As a matter of fact, the evidence shows that Triad received money for [payments to foreign officials] in advance of any disbursements, if such were made. Thus there was nothing to reimburse on the basis of the record before us.

First Decision at 13. The tribunal considered whether a payment pursuant to an earlier, *continuing* promise might subject Northrop to possible prosecution, but found no evidence in the record to support a finding that a present payment by Northrop to Triad on the claims asserted would be used presently to influence the award or retention of business in violation of the FCPA. First Decision at 15.

**26.** Northrop relies upon *SEC v. Katy Indus. Inc.*, No. 78C–3476 (N.D.Ill. Aug. 30, 1978), in which the SEC obtained a consent decree enjoining Katy Industries from violating the FCPA. Katy Industries was alleged to have entered into an agreement in 1975 to make payments to a consultant based on a percentage of its net profits under a 30-year contract, knowing or with reason to know that the payments would be shared with a high-level government official. Even assuming, contrary to the evidence as found by the tribunal, that Triad made a similar continuing promise to Saudi officials, *Katy Indus.* does not have precedential value for the purposes of applying the FCPA to the Northrop-Triad Agreement. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934, 43 L.Ed.2d 149 (1975) (consent decrees should be construed "basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation").

In addition, in an action instituted by the SEC prior to 1977, the District Court for the District of Columbia, entered a Final Judgment of Permanent Injunction, prohibiting Northrop from "using or aiding and abetting the use of corporate funds of Northrop Corporation or any of its affiliates or subsidiaries for unlawful political contributions or other similar unlawful purposes." In 1977, after the FCPA was enacted, Northrop petitioned that court to modify the terms of its injunction to provide for judicial

## CONCLUSION

The tribunal issued its award in favor of Triad on claims arising in Phases II, III, IV, and Product Agreement No. 5 of Phase V of the Peace Hawk Program. Phase II and Phase III commissions clearly were "earned" prior to enactment of the Saudi Decree. With respect to Phase II and Phase III, performance of the Agreement was completed before September 1975, except for Northrop's final commission payment, due on November 10, 1975. Any outstanding payments due under Phase II or Phase III, therefore, are unaffected by the Saudi Decree. The tribunal's award with respect to Triad's Phase II and Phase III claim is confirmed, as is its award denying recovery on Northrop's counterclaim for Phase IV advance commissions.

The Saudi Decree prohibits payment of commissions due under Phase IIIE, Phase IV and Phase V. The tribunal's award with respect to Triad's Phase IV and Phase V claims is vacated.

See also, 584 F.Supp. 909.

review of any arbitration award issued against Northrop pursuant to the Agreement, to determine whether payment of Triad's claims would violate the injunction. By order dated February 29, 1980, the court refused to so modify its injunction, but stated that, under the terms of the injunction, Northrop was specifically "barred from violating the Foreign Corrupt Practices Act of 1977." Because I conclude that the FCPA is not retroactive, enforcement of that portion of the tribunal's award based upon pre-FCPA transactions has no bearing on Northrop's compliance with the terms of the above injunction.