Filed: February 12, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 94-2043
(CA-94-41-A)

Irfan Khalid Ali,

                              Plaintiff - Appellant,

        versus

Khaled Bin Fahd Al-Faisal, etc.,

                              Defendant - Appellee.

O R D E R

        The Court amends its opinion filed December 7, 1995, as follows:

        On page 8, second full paragraph, line 4 -- the firm "Baker & Botts" is corrected to read "Baker & McKenzie."

                              For the Court - By Direction

                              /s/ Bert M. Montague

                              Clerk

UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

IRFAN KHALID ALI,
Plaintiff-Appellant,

v.

KHALED BIN FAHD AL-FAISAL, d/b/a
McDonald's Restaurant, d/b/a Al-
Riyadh International Group,
individually,                                          No. 94-2043
Defendant-Appellee,

and

AL-RIYADH INTERNATIONAL
CORPORATION, d/b/a Al-Riyadh
International Group,
Defendant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CA-94-41-A)

Argued: July 13, 1995

Decided: December 7, 1995

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Joseph Peter Drennan, Alexandria, Virginia, for Appel-
lant. Frederick Michael Switzer, III, DANNA, SORAGHAN,
STOCKENBERG & MCNARY, St. Louis, Missouri, for Appellee.
**ON BRIEF:** Jo Anne Peele, Scott M. Badami, Phillip M. Seligman,
BRYAN CAVE, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Irfan Ali, who filed a breach of contract claim against Prince Kha-
lid Bin Fahd Al-Faisal ("Al-Faisal"), appeals from the district court's
grant of summary judgment in favor of the defendant. Ali concedes
that no written contract exists to define the parties' rights and respon-
sibilities towards one another, but claims that Al-Faisal reneged on an
oral agreement to include Ali as a fifty-percent partner in McDonald's
restaurant franchises that Al-Faisal intended to develop in Saudi Ara-
bia. We hold that summary judgment was properly granted, because
providing Ali, a United States citizen, with a property interest in a
Saudi business would contravene Saudi Arabian law, and accordingly,
we affirm.

I.

Ali is a naturalized United States citizen of Pakistani origin who
now resides in Virginia. Al-Faisal, a citizen of Saudi Arabia and a
member of that country's royal family, also maintains a home in Vir-
ginia. The two men met in 1987 and developed a business relationship
in early 1988, forming Tri-Crescent Partnership. Based on a written
partnership agreement, they were to be 50-50 partners in the venture,
with Al-Faisal serving as a passive investor and Ali functioning as the

2

day-to-day manager of the partnership's real estate developments. As part of the agreement, Ali drew $5,000 per month against his future partnership earnings for living expenses. In the late 1980s, the men formed an allegiance with Wheat First Securities, creating Wheat International--a company designed to bring Middle East investors into the United States market.

With the crash of the Virginia real estate market in 1990, Ali and Al-Faisal's business relationship began to sour. Ali lost his home and filed for bankruptcy; Al-Faisal blamed Tri-Crescent's failures on Ali. In addition, Wheat International made no money, and Ali incurred substantial expenses traveling on behalf of the company.

Ali and Al-Faisal disagree as to who initiated the idea of obtaining a McDonald's franchise in Saudi Arabia. Ali contends that he traveled to Saudi Arabia after the Persian Gulf War, noticed there were no American fast-food chains in the country, and suggested to Al-Faisal that the two men attempt to secure the first McDonald's franchise in the country. Conversely, Al-Faisal claims that he had wanted to purchase a McDonald's franchise for Saudi Arabia ever since the late 1970s, but that it was James Wheat, Jr., head of Wheat First Securities, who suggested the idea to him in the early 1990s.

The oral contract that is the subject of this litigation was allegedly entered into by the parties on August 29, 1991, at Al-Faisal's home. According to Ali, the two agreed that Ali would attempt to secure McDonald's franchises for Al-Faisal in Saudi Arabia, and, in return, Ali would get a fifty percent interest in those franchises. In order to fulfill his obligations under the contract, and thereby receive his fifty percent interest in a business venture worth an estimated $2.7 million, Ali had to attend a September 1991 meeting with the Chairperson of McDonald's International, James Cantalupo. Regardless of how Al-Faisal ultimately secured the franchise, Ali argues that he would be assured of his percentage, so long as he flew to Illinois for that one meeting. In his deposition testimony, Ali explained twice his conception of the agreement:

> The terms and conditions, I reiterated again that we would have a fifty-fifty partnership in Saudi Arabia, that I would be a fifty percent owner of any franchise if we were

3

successful in receiving the franchise in Saudi Arabia, and that, if necessary, that I would form a corporation that would form the joint venture with him.

* * * *

The specifics of the terms of that contract are as I have stated to you already, that I would be a fifty-fifty owner of the franchise in Saudi Arabia along with Khaled[Al-Faisal] or one of his companies, and that we would form this franchise together. He would help in arranging all the financing in country. I would do all the work in terms of getting the McDonald's Corporation convinced that we are the right party to do the business and to do the deal. That would be my contribution to this partnership. And his contribution, as I stated earlier, would be the financing of the operation. We shook hands on that.

Joint Appendix, at 376-78. Apart from Ali's own account of his August 29, 1991 meeting with Al-Faisal, nothing in the record supports Ali's claim that the parties agreed to such a division of profits.

According to Ali, if "the meeting went successfully with [the Chairperson of McDonald's International] and that resulted in a successful award of a franchise," he would be entitled to his fifty percent share in the franchise. When asked to explain what he meant by the meeting needing to be "successful," Ali replied that "[m]y measure of success would be a personal measurement. I think you could measure success in any which way you want." In short, therefore, so long as Ali deemed the meeting a "success," he would be entitled to his share of the franchise.

Notably, on the day that Ali and Al-Faisal allegedly came to this meeting of the minds, Al-Faisal had removed Ali as managing general partner of Tri-Crescent. By mid-1990, Al-Faisal had invested $1 million in land located in Virginia, yet there had been absolutely no development of that real estate. At that point, Al-Faisal claims he already was looking to replace Ali. According to Al-Faisal, he only agreed to allow Ali to attend the meeting with Cantalupo so that Ali could maintain his self-respect after being fired from his position at

4

Tri-Crescent. Finally, despite Ali's suggestion that the 50-50 deal was developed because of his key role in setting up the September 1991 meeting with McDonald's officials, the meeting between Al-Faisal's people and Cantalupo had already been scheduled by August 29.

Ali's role in the franchise negotiations appears limited to his participation in the single, introductory meeting with McDonald's officials. Even that involvement was limited by the fact that Ali was only one of three individuals to meet with Cantalupo on that day. Ali was accompanied by two Wheat First Securities employees, John Maxwell and Mark Gambill, both of whom knew Cantalupo personally. Prior to the September meeting, Ali had never met Cantalupo. Although Al-Faisal concedes that Ali assisted in making the initial pitch for the franchise, Al-Faisal, Cantalupo, Maxwell, and Gambill also pointed out that Ali spent at least a portion of the time speaking with Cantalupo about the prospect of expanding McDonald's into Ali's native Pakistan. Ali's discussion of franchising opportunities in Pakistan infuriated Al-Faisal.

Despite Ali's presence at the September 1991 meeting, it was not until December 18, 1992--fifteen months later--that McDonald's and Al-Faisal entered into a Franchise Development Agreement for Central and Eastern Saudi Arabia. Cantalupo stated in a deposition that he never considered the September 1991 meeting to have had much, if any, bearing on McDonald's ultimate decision to award a Saudi Arabian franchise to Al-Faisal in December of 1992. See id. at 734 (testifying that McDonald's Corporation never seriously considers a prospective applicant for a franchise prior to having met the individual). In Cantalupo's words, the September 1991 meeting was only exploratory in nature. Instead, it was during a July 1992 visit by McDonald's officials to Saudi Arabia that an all-important interview with Al-Faisal took place. According to Cantalupo, it was that interview, and not the meeting ten months earlier, that resulted in the awarding of a franchise to Al-Faisal.

Not until October 1992, when it became apparent that Al-Faisal would receive a license to develop and operate McDonald's restaurants in Saudi Arabia, did Ali remind Al-Faisal of his partnership interest in the McDonald's franchise. When Ali broached the issue, Al-Faisal denied ever having agreed to such a proposal and refused

5

to recognize Ali as a partner in the venture. Al-Faisal opened his first McDonald's restaurant in December 1992, one year after he received his franchise license. Three months later, in February 1994, Al-Faisal opened a second McDonald's. Ali was not involved in the development of either franchise.

Ali filed a complaint against Al-Faisal on January 14, 1994, in the United States District Court for the Eastern District of Virginia, alleging breach of contract. In Virginia, a suit on an oral contract must be brought within three years after the cause of action--the breach of contract--accrues. Goodell v. Rehrig Intern., Inc., 683 F. Supp. 1051, 1054 (E.D. Va. 1988) (citing Va. Code Ann. §§ 8.01-246(4) and 8.01-230 (1984)), aff'd, 865 F.2d 1257 (4th Cir. 1989). In this case, a breach would have technically occurred in December of 1992, when Al-Faisal received the franchise, but denied Ali a percentage in the business. Suit was, therefore, filed within the three year statutory period. Six months after Ali filed his claim, Al-Faisal filed a motion for summary judgment, claiming that (1) the contract was void for vagueness; (2) the contract was illegal under Saudi law; (3) the oral agreement violated the Statute of Frauds; and (4) the damages claimed by Ali were speculative. In a decision announced from the bench, the district court held that while a breach of contract had been established, Ali did not have the capacity to enter into a contract to be performed in Saudi Arabia. Consequently, summary judgment was granted on the ground that the contract was illegal under Saudi law. This timely appeal followed.

II.

We review the entry of summary judgment de novo and apply the same legal standards that the district court employed when considering the motion for summary judgment. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, 115 S. Ct. 67 (1994); Kowaleviocz v. Local 333 of International Longshoremen's Assn., 942 F.2d 285, 288 (4th Cir. 1991). The grant of summary judgment turns on whether there exists a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Stroud, 13 F.3d at 798. In this appeal, if we determine that the alleged contract between Ali and Al-Faisal cannot be enforced under Virginia law because per-

6

formance would, in turn, be illegal under Saudi Arabian law, the awarding of summary judgment in favor of Al-Faisal is appropriate.**1**

In diversity suits, a federal court must apply the law of the forum state, including its choice of law principles.**2** Erie R.R. v. Tompkins, 304 U.S. 64 (1938). Here, Virginia law governs, because the alleged contract was formed in Virginia, at the house of Al-Faisal. Virginia adheres to a traditional choice of law doctrine, and, in the context of contractual disputes, questions of breach are determined by the law prevailing at the place of performance. Chesapeake Supply and Equipment v. J.I. Case Co., 700 F. Supp. 1415, 1417 (E.D. Va. 1988) (citing 16 Am. Jur. 2d, Conflict of Laws § 96, at 160-61 (1979)). In this case, it is undisputed that performance was to occur in Saudi Arabia, the site of Al-Faisal's McDonald's franchises. Ultimately, then, the legality of this alleged contract must be evaluated under Saudi law. See Veitz v. Unisys Corp., 676 F. Supp. 99, 104 (E.D. Va. 1987) ("In respect for foreign law, Virginia law bars claims on contracts governed by foreign law if that foreign law would bar the claims."); see also Restatement (Second) of Conflict of Laws, § 202(2) (noting that "[w]hen performance is illegal in the place of performance, the contract will usually be denied enforcement").

In determining a question of foreign law, a court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1; cf. Triad Financial Establishment v. Tumpane Co., 611 F. Supp. 157, 164 (N.D.N.Y. 1985) (noting that foreign law was once treated as a question of fact, but is now considered a question of law under Rule 44.1). Accordingly, we review de novo the district court's consideration of the contract's legality under Saudi Arabian law.

---

**1** For purposes of our discussion of the contract's legality, we assume the existence of a sufficiently definite contract.

**2** We note that the district court properly possessed jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), under which district courts have original jurisdiction over cases between "citizens of a State and citizens or subjects of a foreign state."

7

Like the district court, we find the parties' franchising agreement unenforceable, because it violates specific Saudi Arabian regulations governing the operation of business franchises in that country. Each provision of Saudi law included in the record is designed to insulate the Saudi economic environment from partici pation by non-Saudi citizens. Article I of the Commercial Agencies Law provides:

> Non-Saudis, whether in their capacity as natural or juristic persons, shall not be permitted to be commercial agents in the Kingdom of Saudi Arabia. Saudi companies acting as commercial agents shall have entirely Saudi capital, and the members of their boards of directors and those authorized to sign for them shall be Saudis.

Article I, Royal Decree M/11 (1962), as amended by Royal Decree M/5 (1969) and Royal Decree M/8 (1973), included in Joint Appendix, at 882. In short, only Saudi Nationals are permitted to own Saudi companies. See Business Laws of Saudi Arabia, Vol. I (ed. Nicola Karam, 1994), published by Graham & Trotman Ltd., included in Joint Appendix, at 895. More recent versions of the Saudi Arabian Commercial Agencies Law continue to erect a wall between non-Saudis and Saudi businesses. See Article II, Ministerial Order No. 1897 of the Saudi Arabian Ministry of Commerce (1981) (maintaining rule that non-Saudis cannot operate as commercial agents in Kingdom of Saudi Arabia or possess any ownership interest in Saudi companies). In April 1992, the Saudi Minister of Commerce promulgated an additional order making it clear that Saudi Arabia's Commercial Agencies Law applies to franchising. See Article I, Ministerial Order No. 1012 (1992).

This order serves as the clearest evidence that non-Saudi nationals are precluded from possessing ownership interests in Saudi Arabian franchises. Testifying as Al-Faisal's expert witness, Howard Stovall, a partner in the law firm of Baker & McKenzie, who specializes in Middle Eastern legal matters, testified that, in light of Ministerial Order 1012, "a foreign (non-Saudi) party wishing to invest in, establish or similarly participate in a Saudi Arabian business enterprise . . . must obtain approval from the Saudi Arabian government." Declaration of Howard L. Stovall, included in Joint Appendix, at 883. Such approval

8

is provided in the form of an investment license issued by the Foreign Capital Investment Committee ("FCIC").

We decline to engage in mere speculation as to whether Ali could obtain a Foreign Capital Investment License that would enable him to circumvent Saudi Arabia's restrictive commercial agencies laws and operate as a co-owner of Al-Faisal's McDonald's franchises. The grant of such licenses is conditioned on a foreign investor demonstrating:

> (1) that the foreign capital is to be invested in development enterprises, which for the purposes hereof do not include enterprises for the extraction of petroleum and mining; and

> (2) that the foreign capital is accompanied by foreign technical expertise.

Article II, Investment of Foreign Capital Regulation, No. M/4 of 2.2.1399 A.H. Without any experience operating in the food services industry, Ali's chances of convincing the Minister of Industry and Electricity that Ali would bring "foreign technical expertise" to the McDonald's franchising business appear remote. Regardless of Ali's chances for success, it is simply not enough for Ali to claim that he theoretically could have obtained an FCIC license. As we observed in Baber v. Hospital Corp. of Am., 977 F.2d 872 (4th Cir. 1992), "unsupported speculation is not sufficient to defeat a summary judgment motion." Id. at 875 (quoting Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)). Viewing all evidence in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), does not require that we speculate on Ali's chances of securing the necessary licensing in Saudi Arabia for his business ventures. Finding no basis upon which Ali could circumvent the clear dictates of Saudi Arabian commercial law,[3] we hold that

---

[3] We find wholly unavailing Ali's attempt to dismiss the relevance of Saudi regulations by merely reciting passages from the Qu'ran that refer to a generalized notion of "ibaha," or freedom of contract. Regulations promulgated by the Kingdom of Saudi Arabia to govern a multi-faceted,

9

enforcement of the oral contract between Ali and Al-Faisal would be illegal. For Ali to operate as a fifty percent <u>owner</u> of a McDonald's franchise located in Saudi Arabia contravenes the requirement under Saudi law that only Saudi nationals, in the absence of specific exemptions, be permitted to operate as commercial agents in that country.

III.

Having sustained the award of summary judgment on the ground that performance of the contract would be illegal under Saudi law, we find no need to address Al-Faisal's claim that the terms of the contract are indefinite, uncertain, and vague. The district court refused to grant Al-Faisal's summary judgment motion on this second ground. Disputes over specific provisions of a contractual agreement are factual matters that are best resolved initially by a trier of fact, rather than an appellate court. The grant of summary judgment is upheld on the sole ground that performance would be illegal under Saudi Arabian law. The judgment of the district court is, therefore,

<u>AFFIRMED</u>.

_____

modern society in no way displace the importance of the Qu'ran as the center of religious life in the Islamic world. Contrary to the position espoused by Ali, however, it is possible for Saudi Arabia to remain faithful to the principle of ibaha, yet develop regulations that define the parameters within which parties are able to contract with one another.

10